[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12059

_____

D.C. Docket No. 9:08-cv-80529-KAM

LEROY POOLER,

Plaintiff-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 17, 2012)

Before DUBINA, Chief Judge, and HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

Florida death row inmate Leroy Pooler appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Pooler argues that his trial counsel was constitutionally ineffective in the penalty phase of his murder trial for (1) failing to discover that certain information Pooler himself told counsel about his background was false, and (2) relying on court-appointed competency experts to testify instead of retaining defense experts to investigate mitigation evidence specifically. The Florida state courts denied Pooler's ineffective assistance of counsel claims. After review and oral argument, we conclude, as did the district court, that the state courts' denial of Pooler's claims was not unreasonable. We affirm.

## I. BACKGROUND

### A.    Facts of the Crime

On January 30, 1995, Pooler murdered his ex-girlfriend, Kim Brown, after learning that she had begun seeing another man. Before the murder, Pooler threatened to kill Brown. Two days later, Pooler went to Brown's apartment and shot her five times while she begged Pooler not to kill her. Pooler also shot Brown's younger brother. The Florida Supreme Court summarized the evidence presented at the guilt phase of Pooler's trial:

> On January 28, 1995, Carolyn Glass, a long-time acquaintance of Kim Brown, told her that Pooler had said he was going to kill her because if he could not have her, no one else would. . . . Two days later, Pooler knocked on the front door of the apartment where Kim and her

younger brother, Alvonza Colson, lived with their mother. Seeing Pooler through the door window, Kim told him that she did not want to see him anymore. Alvonza opened the door halfway and asked Pooler what he wanted but would not let him in. When Pooler brandished a gun, Alvonza let go of the door and tried to run out the door, but he was shot in the back by Pooler. Pooler pulled Alvonza back into the apartment by his leg. Kim begged Pooler not to kill her brother or her and began vomiting into her hands. She suggested they take Alvonza to the hospital. Pooler originally agreed but then told Alvonza to stay and call himself an ambulance while Pooler left with Kim. However, rather than follow Pooler out the door, Kim shut and locked it behind him. Alvonza told Kim to run out the back door for her life while he stayed in the apartment to call for an ambulance. When he discovered that the telephone wires had been cut, he started for the back door, just as Pooler was breaking in through the front entrance.

Pooler first found Alvonza, who was hiding in an area near the back door, but when he heard Kim yelling for help, he left Alvonza and continued after Kim. When he eventually caught up with her, he struck her in the head with his gun, causing it to discharge. In front of numerous witnesses, he pulled her toward his car as she screamed and begged him not to kill her. When she fought against going in the car, Pooler pulled her back toward the apartment building and shot her several times, pausing once to say, "You want some more?" Kim had been shot a total of five times, including once in the head. Pooler then got into his car and drove away.

Pooler v. State, 704 So. 2d 1375, 1377 (Fla. 1997) ("Pooler I").

Police arrested Pooler at his home. The State indicted him on charges of first-degree murder, attempted first-degree murder, and armed burglary. The state

3

trial court appointed veteran criminal defense attorney Michael Salnick to represent Pooler.[1]

## B.    Trial Counsel's Investigation of Mitigating Evidence

In May 1995, trial counsel Salnick moved the court for funds to hire an investigator to help prepare for trial, and also specifically to travel to Louisiana—where Pooler grew up and where his family still lived—to interview witnesses "for Phase 2 [i.e., penalty phase] discovery." The state trial court granted the motion, and Salnick retained an experienced private investigator, Marvin Jenne.

Salnick and Jenne had worked together "in almost every significant case" Salnick had in private practice.[2] Salnick instructed Jenne to "find anything and everything" he could about Pooler, whether good or bad. Salnick, as he later testified in postconviction proceedings, wanted to consider anything that would save his client's life.

Investigator Jenne's invoice includes entries showing these penalty-phase-related efforts: (1) attending a 2.2 hour meeting with Pooler to discuss "potential family members in Louisiana to be interviewed in Phase II investigation"; (2)

---

[1]At the time of his appointment to represent Pooler, Salnick had been practicing law for about sixteen years. Salnick had experience handling murder cases and penalty-phase proceedings.

[2]At the time of Pooler's case, Jenne had been an investigator for fifteen years and had worked on five to ten capital cases.

sending letters to Pooler's family members in Louisiana; (3) making telephone calls to family members Delores Pooler, Darren Warren, and Carolyn Upps; (4) traveling to Baton Rouge, Louisiana for three days to interview Pooler's family members regarding mitigation; (5) sending multiple letters to schools Pooler attended; and (6) attending a 1.9 hour meeting with Pooler to discuss the interviews with Pooler's family members.[3]

Pooler told Salnick and Jenne that he graduated high school, had four daughters in Louisiana, and worked for seven years at a moving company. Pooler also reported that he served in the United States Marine Corps during the Vietnam War, re-enlisted after his original period of enlistment, and received an honorable discharge.

Investigator Jenne tried to corroborate all the background information he received from Pooler by talking with other persons. Jenne made telephone calls and sent letters requesting Pooler's school records, but he "was basically told [the records] were not available." Jenne asked Pooler's relatives, including his father, whether Pooler graduated from high school. The relatives said Pooler graduated.

The defense made an effort to obtain Pooler's military records, but the attempt was unsuccessful. Pooler's brother confirmed that Pooler served in the

---

[3]Jenne's records contain the name and telephone number of Pooler's nephew Brian Warren, who lived in Orlando, Florida. Jenne did not recall whether he ever spoke with Brian Warren.

Marines and was honorably discharged.  Jenne asked other relatives about Pooler's military service, and all of them said he served honorably in Vietnam.

Jenne obtained some employment records relating to Pooler's work history in Palm Beach County, Florida.  Jenne interviewed two of Pooler's co-workers at the moving company in West Palm Beach, Alice Bradford and Carlton Weeks.  Salnick decided Alice Bradford would be the better witness because Weeks, who was Pooler's supervisor, made some comments that Salnick "thought could have been troublesome and if he was deposed and it was further explored there might have been some more negative information that came out."

Weeks stated that Pooler was a "good worker as long as things went totally his way," but Pooler was "aggressive" and had "a chip on his shoulder."  Pooler was short-tempered, wanted to take charge on every task he was assigned, and most of his co-workers "did not care to work with him."  Because of Pooler's aggressiveness, there was "[a]lways a problem" between him and his co-workers.  Pooler "was just narrow minded and hard headed and very aggressive."  Pooler got into arguments with co-workers that Weeks had to resolve.  Weeks found it difficult to find people to work with Pooler "because of his temperament."

Furthermore, Weeks believed that Pooler "appear[ed] to be a violent person."  Pooler owned a gun and sometimes brought it to work.  One time, Pooler got into an argument with a co-worker and returned with his gun and was "waving

it around threatening people." In fact, Salnick reported that "[o]ne of the things that ran through a lot of stuff that we looked at, was that Mr. Pooler had a violent background, he had been known to carry a gun, chased people, he'd been known to argue, to hit somebody."

The defense team investigated whether Pooler had a drinking problem, which entailed obtaining police reports and interviewing relatives and current and former employers. Salnick discovered before trial that Pooler had gone to the police department a few hours before Brown's murder to report a crime. The police report stated that Pooler had been sitting in his car early that morning with a friend of Pooler's girlfriend. Pooler "fell asleep due to intoxication," and when he awoke about two hours later, "his wallet was in his front pocket and $301.00 were missing." Pooler reported the theft occurred about 3:00 am, and he arrived at the police station at 6:43 am.

Pooler told Salnick that the woman who robbed him was a prostitute. Salnick did not want the jury to be aware of Pooler's time spent with a prostitute a few hours before he murdered his ex-girlfriend, stating later that "[t]here is no way I would have done that. I just didn't think it was appropriate."[4]

## C.    Pretrial Competency Hearing

---

[4]Moreover, Salnick chose not to pursue a voluntary intoxication defense in the guilt phase because Pooler told Salnick he did "not want a defense that is going to admit that he committed the crime."

In November 1995, the state trial court held a hearing to determine whether Pooler was competent to stand trial. The state trial court appointed clinical neuropsychologist Dr. Laurence S. Levine and psychiatrist Dr. Norman Silversmith to examine Pooler and testify at the competency hearing.

Dr. Levine examined Pooler for six hours. Dr. Levine interviewed Pooler, administered a number of neuropsychological tests, and reviewed Pooler's jail medical records and arrest record. Among the tests Dr. Levine administered was the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"). Pooler's overall score was 80, which was at the bottom of the low-average range. Dr. Levine found no evidence of malingering.

Dr. Levine found Pooler overall to be competent. Dr. Levine also found that Pooler "would be expected to have some difficulties," though not insurmountable ones, in helping his counsel to plan his defense and to challenge the State's witnesses. Pooler's attention functioning "was not terribly impaired but it was not optimum." Additionally, Pooler's vocabulary and reading ability were "far lower than the average range." Thus, Pooler would "require somewhat more support and more explanation." Nevertheless, Dr. Levine opined that Pooler "was a fine subject," "listened carefully to [Levine's] explanation of the evaluation," and "responded very appropriately and intelligently with regard to protecting [his] confidential [legal documents]."

8

Dr. Levine believed it possible that Pooler had hypothyroidism and psychomotor retardation, which could affect his ability to assist counsel. Dr. Levine recommended that his attorney take time to help explain complex legal issues to Pooler and use simple language in doing so.

Pooler reported no prior psychiatric treatment to Dr. Levine. All Dr. Levine could find in the records he reviewed was treatment for depression following Pooler's arrest for Brown's murder.

Psychiatrist Dr. Norman Silversmith, the second expert to testify at the competency hearing, examined Pooler for about an hour. Dr. Silversmith interviewed Pooler but "did not run any standard clinical psychological tests." Dr. Silversmith's questioning of Pooler included "background information, marital status, school history, work histories, and . . . medical history."

Pooler appeared to have no difficulty understanding Dr. Silversmith, had an intact memory, and was not delusional or confused. Pooler's psychological functioning was within normal limits.

Dr. Silversmith opined that Pooler was competent to stand trial. Although the purpose of Dr. Silversmith's evaluation of Pooler was competency and not "to make a diagnostic impression determination," he nevertheless felt "there was no question that there was a personality or character disorder" present, though he "did not specify whether it would be antisocial or passive dependent." Dr. Silversmith

9

"also indicated that [Pooler had] a mental disorder non-psychotic, unspecified." Dr. Silversmith allowed, though, that "incarceration in and of itself contributes to mental or emotional issues, so it's an unspecified mental disorder." Dr. Silversmith did not make a definitive diagnosis, but he believed Pooler was certainly suffering anxiety and "a certain degree of depression," which "could certainly have suggested an adjustment disorder, adjacent with incarceration." Dr. Silversmith's report noted that Pooler did not "appear to be suffering from any overt mental illness or mental retardation."

At the conclusion of the competency hearing, the state trial court found that Pooler was competent to stand trial.

## D.     Guilt Phase

The guilt phase of Pooler's trial lasted from January 9 to 17, 1996. The State called victim Alvonza Colson, who described Pooler's shooting him, murdering his sister, and the burglary. Colson identified Pooler as the perpetrator. The State also called witnesses who testified, among other things, that: (1) a week before the murder, Pooler told one of Brown's neighbors that he would kill Brown because he loved her and, if he could not have her, no one else would; (2) bystanders, who knew Pooler, saw him shoot Brown while she begged for her life and heard Pooler yell at Brown while he was doing so, "Bitch, didn't I tell you I [would] kill you?"; (3) Pooler shot Brown and she fell, at which point he turned

10

her over, asked if she "want[ed] some more," and shot her in the head; (4) after

Pooler shot Brown, he kicked her body before getting in his car and driving away;

and (5) none of Brown's five gunshot wounds were immediately fatal.

The jury convicted Pooler of the first-degree murder of Brown, the

attempted first-degree murder of Colson, and the burglary of Brown and Colson's

home.

## E.    Penalty Phase: Defense's Mental Health Testimony in Mitigation

The penalty phase ran from February 2 to 8, 1996.  The State put forth no

evidence, resting upon the guilt-phase evidence.  The defense called, as mitigation

witnesses, mental health experts and lay witnesses.  The defense wanted to show

that Pooler had low intelligence and mental health disturbances and problems, but

yet had worked hard and served in the military, including in Vietnam, and should

have his life spared.

Neuropsychologist Dr. Levine first testified that he was appointed by the

state trial court to evaluate Pooler's competency.  Dr. Levine described the

evaluation, which included assessments of Pooler's intelligence and cognitive

functioning.  Pooler's cognitive functioning was "in the low average to mildly

impaired range."  Pooler's performance IQ results ranged from about 75 to 85.

Low average is 80 to 89, and borderline retarded is 70 to 79.

11

On the WAIS-R intelligence test, Pooler's scores were 81 for verbal IQ, a 79 for performance IQ, and a full-scale IQ of 80. Pooler's scores put him "right on the cusp of the low average to the borderline range." Pooler scored in the borderline range on four of nine WAIS-R subtests. Pooler's reading ability, which was at the third-grade level, "was dramatically impaired."

Pooler shared with Dr. Levine portions of his educational, military, and job history. Pooler told him that Pooler graduated from high school, served in the military and achieved the rank of sergeant, and held down a job for an extended period of time. To Dr. Levine, this suggested Pooler's intelligence should be in the average range, not low average to borderline, but Dr. Levine found that all of Pooler's test results were internally consistent, and there was no evidence of malingering.

Dr. Levine also talked about Pooler's mental health. Dr. Levine learned from the jail's medical records that Pooler, after his arrest, "had a significant emotional reaction to whatever it was that was going on." Pooler "had pretty much resolved his mental health issues" by the time Dr. Levine examined him. Dr. Levine noted, though, that Pooler appeared to be "experiencing some depressive symptoms." Dr. Levine's "clinical impression" was that Pooler had some symptoms of depression but "did not meet the criteria for a [depression] diagnosis."

12

In mitigation, the defense next called psychologist Steve Alexander. Dr. Alexander, also appointed by the court, had evaluated Pooler's competency, too.[5] Dr. Alexander concluded that Pooler was not competent to stand trial.

Dr. Alexander admitted that Pooler's ability to appreciate the criminality of his conduct, or to conform his conduct to the law's requirements, was not impaired. Dr. Alexander saw no signs of "any long-term mental illness, or personality disorder or disturbance that would have been existing at the time of the shooting."

However, Dr. Alexander believed Pooler was not competent because he did not fully understand the current legal proceedings. Other inmates were telling Pooler incorrect information and Pooler "was grossly misinformed for what appropriate court procedure was and what role he would take in trial." Thus, Pooler "would totally misunderstand the proceedings as they were unfolding, and due to misunderstandings and misperceptions maybe even be disruptive."

Although Dr. Alexander found it "clear in talking to [Pooler that] he's a man of relatively limited intelligence," he did not need to administer an IQ test because Pooler was "not so mentally deficient or retarded that that was the basis of an

---

[5]The record does not reveal when Dr. Alexander was appointed or why he did not testify at the pretrial competency hearing. Salnick did not call Dr. Silversmith, who testified at the competency hearing that Pooler was competent.

incompetency." Dr. Alexander estimated Pooler's IQ was between 75 and 85, which was "in the lower low average range . . . or the upper end of a borderline."

According to Dr. Alexander, Pooler was gullible and displayed "some gross misperceptions about the legal system and the way it worked." Pooler's incompetence to stand trial was not caused by a mental illness, defect, or disease, "but instead was just a real lack of understanding [and] basically distrust, given his situation, . . . being fearful, not knowing who to believe, and then erroneously, given his . . . limitations, erroneously placing value and importance on the opinions of other inmates rather than on his attorney."

In mitigation, the defense also called psychiatrist Jude Desormeau, who testified about Pooler's depression, his being on suicide watch in the jail, and being in the jail's mental health unit receiving treatment. Dr. Desormeau examined Pooler in February 1995 after he was referred by the psychiatric nurse at the jail. Pooler was depressed and anxious and had spoken of harming himself, so he was placed on suicide watch.

Dr. Desormeau concluded Pooler was suffering from "an adjustment disorder with mixed features," making Pooler "very depressed and very anxious and tearful." Dr. Desormeau prescribed a tranquilizer. After seven to ten days, Pooler stabilized and was sent to a different doctor. Pooler was then taken off the tranquilizer.

14

Psychiatrist Dr. Michael Armstrong, a staff psychiatrist at the jail, also testified about Pooler's depression and adjustment disorder. Dr. Armstrong saw Pooler before he was discharged from the jail's mental health unit into the general population. Pooler was in Dr. Armstrong's mental health transitional unit for about two weeks. At first, Pooler reported both that he was depressed and that he heard a voice calling his name, which began when he came to the jail. By the end of his stay, Pooler "was functioning very well and was ready for the general population."

## F.    Penalty Phase: Defense's Lay Witnesses

In mitigation, the defense also called Arthur Rock, a deputy sheriff at the jail, who testified Pooler was "a well-behaved inmate." Rock reviewed Pooler's year-long jail file and reported that Pooler had received only one disciplinary write-up that year, with no indication of violence in the incident.

As for Pooler's long-term employment, co-worker Alice Bradford testified that she worked with Pooler at the moving company for the seven years Pooler was employed there. Pooler was reliable and punctual.

Bradford came to know Pooler outside of work because Pooler would help Bradford, who was a single parent, with yard work. Bradford trusted Pooler in her home, and he never did anything inappropriate there. Bradford trusted Pooler around her son. Pooler was very nice, polite, and respectful whenever Bradford

15

saw him.  Bradford believed Pooler to have fairly good intelligence, but the work he performed for her was uncomplicated, menial labor.

In mitigation, the defense also called Pooler's family members to testify, specifically his brother, sister, and father.  Pooler's brother Henry testified that when he and Pooler grew up, their family was close.  The Poolers were a religious family.  The family was very supportive of Henry and Pooler.  Henry was still close to Pooler and spoke to him on the phone often.  Henry said that he could not ask for a better brother, because Pooler was so "free-hearted."

Pooler had four daughters.  When they were growing up, Pooler provided for them, took care of them, made sure they went to school, and took them to church.

Henry and Pooler went to school in the 1960s, in segregated schools.  Pooler was a pretty good student in high school, as he had to maintain a C average to play on the basketball team.

According to brother Henry, Pooler served more than six years in the United States Marine Corps, including service in Vietnam.  Pooler initially served six months in the active reserve, then re-enlisted for six years.  After Pooler returned from Vietnam, he "looked like he was off a little bit."  Pooler had a bad temper when he returned.

Pooler's sister Carolyn testified that she and Pooler got along well when they were growing up, though it had been awhile since she had seen him.  Pooler

16

"was more like a father figure" to Carolyn, watching over her and taking care of her.

Pooler's family were members of the Baptist Church, and they didn't have trouble getting along with one another "like most families will." They were "there for one another, help[ed] one another, whatever the situation may be."

According to sister Carolyn, Pooler was a "very good father" and a "good provider" for his daughters. Pooler was baptized, prayed a lot, and was "a good person." Carolyn exhorted the jury to "talk to God before you come up with a decision to pass onto Leroy," because she felt Pooler was worthy of "another chance" at God's forgiveness.

Pooler's father Henry Pooler, Sr., also testified. Pooler's father "raised [Pooler] as far as [he] could," and Pooler had never given his father any trouble. Pooler's father told the jury that he loved Pooler and did the best he could for Pooler and his other children.

## G.    Penalty Phase Closing Argument

In his closing argument, defense counsel Salnick argued, among other things, that he put on the mental health experts to show Pooler had borderline intelligence and some mental health problems. To show reliability of the mental health testimony, Salnick emphasized that Dr. Levine and Dr. Alexander both were court-appointed. Salnick discussed the doctors' findings and argued that the jury

could "take into account a mental disturbance, infirmity, problem, intellectual abilities." Salnick argued that when the mental health evidence is combined, it suggests a life imprisonment sentence is appropriate:

> Now, if you start adding those things up and you start with what happened with the suicide watch and the depression, and then you have a doctor that didn't find him incompetent but found him borderline in terms of his intelligence, and you have a doctor who found him incompetent, that tells you that there's some problem here. And I would suggest that from that evidence this problem translates that Leroy Pooler needs the rest of his life in prison, but not to take his life, not here, not here, not in this circumstance.

Salnick pointed out that Pooler was "a 47 year old man with a first grade word level, a third grade reading level." Pooler grew up in segregated schools and did not "get the full benefit of a high school education." Pooler's family members confirmed that, after he returned from Vietnam, "he wasn't the same, he got angry, he was different." That change was significant "because that chain of events ultimately, unfortunately and sadly, gets us right here."

Salnick then recounted the testimony about Pooler's good qualities and argued that, although Brown's murder was "totally inappropriate, totally wrong, totally offensive," it nevertheless represented "one morning out of 47 years." Salnick said that Pooler was "a simple man," "not an intellect," but "a simple man from a hard working background, who for some reason did something way out of his character when this event occurred. This is not the type of a man to be put to death."

18

## H.    Jury Recommendation, Sentencing, and Direct Appeal

The jury recommended death by a nine-to-three vote.  The state trial court sentenced Pooler to death.

The court found three statutory aggravating factors: (1) a prior violent felony conviction (the attempted first-degree murder of Colson); (2) the murder occurred during the commission of a burglary; and (3) the murder was especially heinous, atrocious, or cruel.

The state trial court found the statutory mitigating factor that Pooler murdered Brown while under the influence of an extreme mental or emotional disturbance, but gave that factor little weight.[6]

The state trial court also found the following non-statutory mitigating factors: (1) Pooler served honorably in the military; (2) Pooler had a good employment record; (3) Pooler was a good parent; (4) Pooler had done specific good deeds and had certain good characteristics; and (5) if not given the death penalty, Pooler could receive only life without parole or consecutive life sentences.

---

[6]The state trial court expressly found that the defense had not established certain other statutory mitigating circumstances: (1) Pooler's capacity to appreciate the criminality of his conduct or conform to the requirements of the law was not substantially impaired; (2) Pooler did not act under extreme duress or under the substantial domination of another person; and (3) Pooler's age at the time of the murder (47 years old) was not mitigating.

19

The state trial court gave Pooler's honorable military service considerable weight and attached either some or little weight to the other non-statutory mitigators.[7]

The state trial court concluded that not only did the statutory aggravating factors far outweigh the mitigators, but also that each of the three aggravating factors standing alone would have outweighed all the mitigating factors.

On direct appeal, the Florida Supreme Court affirmed Pooler's convictions and death sentence. Pooler I, 704 So. 2d 1375. The United States Supreme Court denied Pooler's certiorari petition. Pooler v. Florida, 525 U.S. 848, 119 S. Ct. 119 (1998).

## I.    Rule 3.850 Motion and Supporting Materials

On September 17, 1999, Pooler filed in the Florida trial court (the "3.850 court") a Florida Rule of Criminal Procedure 3.850 motion to vacate his convictions and death sentence. Pooler's 3.850 motion claimed, inter alia, that his trial counsel Salnick provided ineffective assistance by failing to adequately investigate and present mitigation evidence in the penalty phase.

Attached to the motion were (1) Pooler's school and military records, and (2) declarations from Pooler's nephews Brian and Darren Warren. Pooler's school

---

[7]The state trial court expressly rejected as non-statutory mitigating factors the following: (1) Pooler had a good jail record and could adapt well to prison life; (2) Pooler could be rehabilitated; (3) Pooler had low normal intelligence; (4) Pooler had mental health problems; and (5) the murder resulted from a heated domestic dispute and Pooler was unlikely to endanger others in the future.

records end at 11th grade.[8]  The school records indicate that Pooler scored 75 on an IQ test in second grade.

Pooler's military records show that he: (1) served as a guard and a rifleman in the Vietnam War; (2) was disciplined frequently, including for six instances during a one-year period of being absent without leave; (3) was punished for using disrespectful language to a superior officer and for refusing to obey orders; and (4) was found guilty in a special court-martial for unauthorized absences and sentenced to a reduction in pay grade and two months' confinement with hard labor.[9]  Pooler received three basic service medals: the National Defense Service Medal, the Vietnamese Service Medal, and the Vietnamese Campaign Medal.

In their declarations, Pooler's nephews Brian and Darren Warren discussed Pooler's emotional problems after returning from Vietnam, his frequent alcohol abuse, and that he was a good father to his four daughters.  Pooler seemed to have flashbacks to his war experiences; became paranoid, moody, and short-tempered; and complained that the army "took [his] mind."  Pooler "began to use alcohol to the extreme," and by early 1995, Pooler's "recreation consisted of hanging out in

---

[8]The military records indicate that Pooler completed two years of high school and left without graduating.

[9]Pooler also received a bad conduct discharge, which the U.S. Navy Court of Military Review reversed on appeal.  Pooler ultimately was released from active duty "under honorable conditions."

21

the parking lot near [victim Brown's] apartment and drinking large amounts of . . . beer and hard liquor." But Pooler loved his daughters, tried to be a good father to them, and was involved in their lives.

## J.    3.850 Evidentiary Hearing

At the 3.850 evidentiary hearing, Pooler called four witnesses: trial counsel Salnick, his investigator Jenne, Detective Francisco Alonso, and psychologist Michael Brannon.[10]

Salnick testified about his pretrial mitigation investigation. Salnick "had no problem communicating with Mr. Pooler," whom he characterized as "articulate." Salnick stated that "Pooler may not have been a [Rhodes] scholar but he was extremely street smart, savvy, and understood exactly what was going on." Pooler had "specific recollection of things just prior to the homicide."

Salnick initially had some concerns about whether Pooler was competent, and said, "in a case involving the death penalty you want to look at everything to make sure your client is okay mentally." Nevertheless, Salnick explained:

---

[10]The 3.850 court conducted proceedings on Pooler's competency. Pooler's 3.850 counsel stated that he (1) "had difficulties in obtaining information from Mr. Pooler, such as employment history, military history, and educational background," and (2) the information on such subjects that counsel obtained from other sources was "inconsistent at best [with] material gathered from Pooler himself."
The 3.850 court appointed mental health experts Dr. John Spencer and Dr. Michael Brannon to examine Pooler's competency. Both Dr. Spencer and Dr. Brannon found Pooler competent, and after a competency hearing, the 3.850 court found Pooler was competent. Dr. Spencer died shortly before the evidentiary hearing.

I was convinced that Mr. Pooler knew what was going on, and that Mr. Pooler was capable of relaying facts to me, Mr. Pooler[] was capable of sharing with me information.  He had no trouble giving us witnesses['] names, even on the eve of trial he came up with something, and you go through that information and you, as an attorney, you have to sort out what you are going to use and what you are not going to use.

Salnick noted that mental health issues are common in penalty phase trials. A penalty phase investigation generally includes a mental health evaluation, although it depends on the case.  Salnick explained that "every attorney [investigates a client's psychological background in] different ways," and that "[s]ometimes you use competency experts, if you need[] them[,] for Phase II; sometimes you hire new experts."

Salnick testified that there were "a bunch" of strategic reasons for not hiring his own mental health experts to testify at Pooler's penalty phase, and instead choosing to call the court-appointed competency experts and the jail personnel. For example, the court-appointed experts had credibility because they supported the defense's position in the penalty phase and were not being paid by the defense team.

Salnick did not hire new doctors to do a penalty phase psychological workup on Pooler because of what he already had gathered.  Salnick said, "We had the competency doctors, we had Dr. Desormeau, we had Dr. Armstrong, we had family members, we had a jail employee, we had a co-worker from his

23

employment and we made a strategic decision as to how we were going to proceed with Phase II."

Salnick testified that he and Jenne tried to get Pooler's military records, but were unsuccessful.  And in any event, had they obtained and presented the military records, it "would have backfired" because Salnick had seen a portion of Pooler's military records in the 3.850 case and "it talks about AWOL, and hitting people, and talks about [Pooler having] not such a stel[l]ar career in the military."  Those things were inconsistent with what the defense was trying to show in the penalty phase, which was that Pooler served his country honorably in Vietnam.

Salnick had argued to the jury that Pooler had a good military record "[b]ased exactly on what [Pooler] told [Salnick]."  Salnick explained:

> If my client tells me that information and my investigator, who I believe went to Louisiana for a period of time, and that's corroborated by a relative, it seems to me that is consistent with our strategy to show that this incident was the product of a man who for 15 years had not been arrested, lived a good life and served our country.  That was certainly what we decided, and based on it at the time it was certainly reasonable.

(Emphasis added).

Salnick learned later that what Pooler told Salnick before trial, and what his relatives confirmed—Pooler graduated from high school—was not true.  But Salnick testified that because his client told him something and his client's relatives backed it up, it was "extremely reasonable" to present it to the jury.

24

Salnick "had no reason to disbelieve" his client. Salnick reiterated that although Jenne tried to get the military records, "with Mr. Pooler telling us that he had been in the service and was honorably discharged, with his brother corroborating that, we didn't need any more at that point."

Salnick was aware of the notion that in a penalty phase trial it can be helpful to present evidence of bad circumstances from the defendant's life so that "perhaps the jury may opt to be forgiving and spare his or her life." Salnick believed that in "some cases that's a very good strategy depending upon the information that you have." And in some cases, there are no significant positive aspects of the defendant's life to present. But in Pooler's case, Salnick had positive evidence, and decided "as a matter of strategy" to present a positive story of Pooler's life:

> We had an individual . . . [who] served his country in Vietnam, re-upped, raised his daughter[s], always took care of them . . . . His brother Henry said how he was a good parent, worked, he had a job, graduated from high school, and how he was honorably discharged, how he did live his good life. . . . Those are the types of things that we thought would be better, so that's—granted, when he was young he had a criminal record but he had 15 years of living, you know, a hard-working productive life; he had one job, I think, for eight years. This is a guy who on that particular day was not the person that he had been for 15 years, and we felt that as a matter of strategy, and a matter of tactic, that's what we wanted to present to the jury. You convicted him. Now let's look at this: He served his country, worked, and took care of his 79-year-old father.

Although during his pretrial investigation Salnick had discovered evidence that Pooler had a bad temper, a violent background, and had been known to argue

25

with people and carry a gun, Salnick "certainly didn't want that to come in" during the penalty phase, for Salnick's plan was "to show the human being that [Pooler] was and could still be if [his] life was spared."

Salnick's investigator Marvin Jenne also described the pretrial investigation. Jenne and Pooler "got along pretty good all the time" and "had a good personal working relationship." Jenne tried to corroborate all the background information he received from Pooler by talking with other persons.

Pooler's 3.850 counsel also called West Palm Beach Police Detective Francisco Alonso, who testified that on the day of Brown's murder, at 6:30 a.m., he took a report from Pooler that $301 had been stolen from his wallet. Pooler said he was sitting in his car with a girlfriend's friend, fell asleep, and awoke to find his wallet missing.

Although Detective Alonso's report stated that Pooler had fallen asleep from intoxication before the alleged theft at 3:00 a.m., when Pooler arrived to make the report, he did not appear drunk. Pooler "smelled like he [had been] drinking, smelled like alcohol but he was coherent, he wasn't slurring his speech, he was attentive, and [he] gave [Detective Alonso] the exact . . . amount of $301." Detective Alonso saw Pooler drive away from the police station, and would not have let him drive if he had thought Pooler was still intoxicated.

26

Psychologist Dr. Michael Brannon, Pooler's final 3.850 witness, evaluated Pooler and administered an intelligence test.  Pooler received an IQ score of 75, which put him in the borderline range.  Dr. Brannon found that Pooler was competent to proceed.  Dr. Brannon believed that, in his self-reporting of his background, Pooler was confabulating—that is, not outright lying but filling in the gaps in one's memory with inaccurate information.

Dr. Brannon believed Pooler "had a severe alcohol problem," a "high probability of severe substance dependency," and alcohol dependency disorders. Dr. Brannon summarized his areas of concern: (1) Pooler's IQ, which fell in the borderline range based on current and past testing; (2) Pooler's neuro-psychological deficits, as shown in Dr. Levine's report; (3) Pooler's alcohol dependence and abuse; and (4) the possibility, which more investigation would be needed to confirm, that Pooler had post-traumatic stress disorder ("PTSD") from Vietnam.  Pooler "certainly shows extreme traumatic stress-like reactions," but Dr. Brannon did not know whether they rose to the level of PTSD.

## K.    3.850 Court's Denial of Pooler's 3.850 Motion

The 3.850 court denied Pooler's 3.850 motion.  The 3.850 court found that Salnick conducted a reasonable investigation and that Salnick's strategy at the penalty phase was "to present the defendant in a positive light, that he had been a productive member of society."  This strategy was "in direct contrast" with

27

Pooler's 3.850 contention that the defense should have offered less-flattering-to-Pooler evidence at the penalty phase, but "[m]ere disagreement with trial strategy does not amount to a basis for postconviction relief."

The 3.850 court concluded, "It is clear from the evidence presented that trial counsel conducted a reasonable investigation, and when written documentation was not available, [an] alternate means of corroboration was found (i.e., family members)." In light of Salnick's investigation and chosen penalty-phase strategy, and "given the corroboration obtained from family members, the failure to obtain [Pooler's] military and employment records was not prejudicial."

As to the mental health experts, the 3.850 court observed that Salnick "opted to present the testimony" of the experts, Drs. Levine, Desormeau, Armstrong, and Alexander, who evaluated Pooler "for competency purposes and mental health issues for the court and in the jail." Moreover, "information regarding [Pooler's] school, military and employment history was given to the mental health experts," and "jail and medical records as well as the fact that there was no prior report of psychiatric treatment were given to the experts." The 3.850 court found that Pooler "failed to meet his burden under Strickland."

As to Salnick's not presenting intoxication evidence, the 3.850 court noted that: (1) Salnick successfully used evidence of Pooler's intoxication a week before the murder, when Pooler threatened Brown in his statement to witness Carolyn

28

Glass, to preclude the State from obtaining an instruction on the cold, calculated, and premeditated ("CCP") aggravating circumstance; (2) Salnick reviewed and discussed with Pooler the contents of Detective Alonso's police report regarding the theft of money from Pooler a few hours before the murder, which stated that Pooler fell asleep from intoxication at 3:00 a.m.; (3) the murder occurred between 8:00 and 9:00 a.m., five to six hours after Pooler fell asleep and about two hours after Pooler reported the theft to Detective Alonso; (4) the police report did not indicate Pooler was drunk when he filed the report; (5) Pooler could recall specific details about the day of the murder; and (6) Salnick was aware of the possibility of presenting evidence of intoxication but decided not to do so.  The 3.850 court also pointed out Detective Alonso's testimony that Pooler did not appear impaired while filing the report and Detective Alonso knowingly permitted Pooler to drive away from the police station.

In sum, the 3.850 court found that Pooler had failed "to prove that trial counsel did not properly investigate mitigating factors to present to the court and the jury" at the penalty phase.  The 3.850 court stated:

> After applying the "highly deferential" scrutiny to counsel's strategic decisions as required by Strickland, the court finds that the defendant has failed to prove that his attorney's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the results of the proceeding would have been different but for counsel's strategic decisions.

## L.    3.850 Appeal

29

Pooler appealed the denial of his 3.850 motion to the Florida Supreme Court, which affirmed.  Pooler v. State, 980 So. 2d 460 (Fla. 2008) ("Pooler II").

The Florida Supreme Court divided Pooler's penalty phase ineffective counsel claim into three sub-parts: (1) failure to investigate and present evidence of Pooler's alcohol abuse or dependency; (2) failure to investigate and present Pooler's school, military, and employment records; and (3) failure to retain mental health experts and provide them with adequate background information.  Id. at 464.

As to alcohol abuse or dependency, the Florida Supreme Court concluded that Pooler had not shown either deficient performance or prejudice:

> First, Salnick's performance was not deficient. . . . Salnick conducted a reasonable investigation into Pooler's background. Neither Pooler nor his family indicated to Salnick that he had a substance abuse problem or that he had been drinking at the time of the shooting. However, Salnick discovered that Pooler had been drinking two days before the murder when he threatened to kill Kim Brown. He used this information during the penalty phase to prevent the State from obtaining an instruction on CCP. Further, Salnick testified at the evidentiary hearing that he chose not to introduce Pooler's police report during the penalty phase because it would open the door for the State to cross-examine Pooler regarding the fact that he had been with a prostitute when he passed out drunk and that she stole his money. This was a reasonable tactical decision made after a reasonable investigation; therefore, Salnick's performance was not deficient. Moreover, . . . none of the evidence introduced by Pooler at the evidentiary hearing shows that he was intoxicated at the time of the murder. Therefore, any alleged failure on Salnick's part to investigate and present it at trial was not prejudicial.

Id. at 466-67 (citation omitted).

As to the school, military, and employment records, the Florida Supreme

Court concluded that Salnick's pre-trial investigation was reasonable given that

Pooler's family members corroborated what Pooler self-reported on these subjects:

> Salnick conducted a reasonable investigation. His failure to obtain
> Pooler's records does not rise to the level of ineffective assistance.
> Pooler consistently represented to Salnick that he was an average
> student, graduated from high school, and was honorably discharged
> from the Marine Corps. To test the validity of Pooler's
> representations, Salnick's investigator, Marvin Jenne, traveled to
> Louisiana and interviewed members of Pooler's family. All of the
> family members Jenne located and interviewed corroborated Pooler's
> positive representations. Further, Jenne made an attempt, albeit
> unsuccessful, to obtain Pooler's school records. Based on Pooler's
> positive representations of himself which were substantiated by his
> family members, Salnick had no reason to believe Pooler's records
> would contain anything negative or mitigating. Therefore, he formed a
> reasonable trial strategy of presenting Pooler in a positive light.

Id. at 467 (citation omitted).  Thus, Pooler did not satisfy the deficient performance

prong of the ineffective assistance test.  Id.

The Florida Supreme Court also found that Pooler failed to show prejudice

given the mitigating evidence Salnick did introduce, Salnick's trial strategy, and

that the additional evidence in these records was a double-edged sword and would

have undermined Pooler's other mitigating evidence:

> Moreover, no prejudice resulted from counsel's choice of strategy. At
> trial, Salnick showed that Pooler had been a productive member of
> society and crime-free for fifteen years prior to the murder. He
> presented evidence that Pooler had served honorably in the military in
> Vietnam, reenlisted, raised a daughter, took care of his relatives, was a
> good parent, worked at the same job for eight years, and was well
> liked by his coworkers. Of all the mitigation presented, the trial court

31

> gave considerable weight only to Pooler's honorable military service. Had Salnick introduced Pooler's military, school, or employment records, he would have undermined Pooler's only significant mitigation. See Reed v. State, 875 So.2d 415, 437 (Fla. 2004) ("An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword."). Furthermore, Pooler's records would not have opened up mitigation leads sufficient to overcome the aggravation found by the trial court. Accordingly, counsel's failure to obtain these records does not undermine confidence in Pooler's death sentence.

Id. at 467–68.

The Florida Supreme Court affirmed the 3.850 court's denial of Pooler's claim about the mental health experts. Id. at 469. The Florida Supreme Court concluded that Salnick's performance was reasonable:

> Salnick reasonably relied on Pooler's corroborated representations regarding his scholastic and military background. Salnick communicated this information to the experts, and Pooler also gave the experts the same information during their evaluations of him. Furthermore, Salnick testified at the evidentiary hearing that he retained these experts because, given their neutrality, they would be more credible and difficult to impeach. This was a reasonable strategic decision.

Id. (citation omitted). The Florida Supreme Court also concluded that, even assuming Salnick's performance were deficient, Pooler did not show prejudice:

> Even if we assume counsel's decision to forego further testing constituted deficient performance, Pooler failed to establish that any prejudice resulted from it. He presented no evidence that the defense experts were incompetent or that they failed to assist in the evaluation, preparation, and presentation of the defense. Nor did Pooler identify anything of substance that a more in-depth psychoanalysis would have added. [3.850 expert] Dr. Brannon's finding that Pooler had neurological damage from head injuries was already indicated in Dr.

32

Levine's evaluation. Also, Dr. Brannon's determination that Pooler had a borderline retarded IQ of 75 does not constitute a clear indication of actual mental retardation because it is within the range estimated by Dr. Alexander and is not substantially inconsistent with the trial court's finding that Pooler had an IQ of 80. Furthermore, because Pooler did not call any of his trial experts to testify at his postconviction hearing, he failed to demonstrate that they would have changed their opinions had they conducted more in-depth psychological evaluations or been provided with his records. Under these circumstances, a new sentencing proceeding is not mandated.

Id. (citations omitted).

The United States Supreme Court denied Pooler's certiorari petition. Pooler v. Florida, 555 U.S. 911, 129 S. Ct. 255 (2008).

## M.    Federal Habeas Proceedings

In May 2008, Pooler filed his 28 U.S.C. § 2254 federal habeas petition, which was denied. The district court concluded, inter alia, that the Florida Supreme Court's decision affirming the 3.850 court's denial of Pooler's penalty-phase ineffective counsel claim was not unreasonable, but granted a certificate of appealability ("COA") on that claim. Pooler appealed.

## II.  STANDARD OF REVIEW

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides that federal courts may not grant a writ of habeas corpus to a state court prisoner on any claim adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal

33

law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012). Thus, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Trepal, 684 F.3d at 1107 (quoting Hardy v. Cross, 565 U.S. —, —, 132 S. Ct. 490, 491 (2011)).

"We review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact." Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010).

## III.  DISCUSSION

### A.    Strickland Test for Ineffective Counsel Claims

Pooler's ineffective assistance of counsel claim is governed by the Supreme Court's two-pronged test announced in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). See Johnson, 615 F.3d at 1330. Under the Strickland test, for a convicted defendant to show that he received constitutionally ineffective assistance of counsel, he must show that (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. A court need not "address both components of

34

the inquiry if the defendant makes an insufficient showing on one." Id. at 697, 104 S. Ct. 2069.

The performance standard is "objectively reasonable attorney conduct under prevailing professional norms." Johnson, 615 F.3d at 1330; see Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). The question is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. In answering this question, we employ a highly deferential review of counsel's conduct, for "we must indulge a strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Rhode v. Hall, 582 F.3d 1273, 1280 (11th Cir. 2009) (quoting Newland v. Hall, 527 F.3d 1162, 1184 (11th Cir. 2008)). In short, Pooler "must establish that no competent counsel would have taken the action that his counsel did take." Id. (quoting Newland, 527 F.3d at 1184).

Attorneys have a duty to conduct reasonable pretrial investigations. Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066. The Strickland Court explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and

35

strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id.

Furthermore, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," for attorneys—usually, and "quite properly"—base their actions "on information supplied by the defendant." Id. at 691, 104 S. Ct. at 2066. "In particular, what investigation decisions are reasonable depends critically" upon information the defendant furnishes to his counsel. Id. The Supreme Court in Strickland noted that, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Id. Therefore, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions." Id.

For prejudice, the standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir.), cert. denied, 132 S. Ct. 190 (2011) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

36

Because Pooler alleges ineffective assistance in the penalty phase, he must show that "there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 1241–42 (quotation marks and citation omitted).

In assessing prejudice, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. 30, —, 130 S. Ct. 447, 453–54 (2009) (quotation marks and brackets omitted). To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 792 (2011). "Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 787–88 (quotation marks and citation omitted).

Because we must view Pooler's ineffective counsel claim—which is governed by the deferential Strickland test—through the lens of AEDPA deference, the resulting standard of review is "doubly deferential." Digsby v. McNeil, 627 F.3d 823, 831 (11th Cir. 2010), cert. denied, 131 S. Ct. 2936 (2011); see also Richter, 131 S. Ct. at 788 ("The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (citations omitted)). The ultimate question before us is not whether

37

Pooler's trial counsel Salnick's actions were reasonable, but whether "there is any reasonable argument that [Salnick] satisfied Strickland's deferential standard." Richter, 131 S. Ct. at 778. If any such reasonable argument exists, then Pooler cannot prevail.

## B.    Performance: Investigation

Pooler argues that Salnick rendered ineffective assistance during the penalty phase investigation by relying on Pooler's own statements about his background without obtaining the school, military, and employment records that would have shown Pooler's positive statements about his background and achievements were untrue. The Florida Supreme Court rejected this contention and found Salnick's penalty-phase preparation was reasonable under the circumstances. Pooler II, 980 So. 2d at 467. The Florida Supreme Court's decision is not contrary to, or based on an unreasonable application of, Supreme Court precedent. Nor is it based on an unreasonable determination of the facts.

It was not unreasonable for the Florida Supreme Court to conclude, based on the evidence presented at trial and in the 3.850 proceedings, that Salnick's investigation of mitigating evidence, and his strategic decisions about what evidence to present in the penalty phase, fell within "the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. The facts show that Salnick, an experienced criminal defense attorney,

38

retained Jenne, a veteran investigator, to help with the mitigation search, and Salnick instructed Jenne to find "anything and everything" he could about Pooler. The two men began by speaking with Pooler himself, who furnished them with information and with names of witnesses. According to Salnick, Pooler had no trouble sharing information, and Jenne thought he and Pooler had a "good personal working relationship."

Nevertheless, Salnick and Jenne did not simply take Pooler's information at face value. They interviewed the witnesses Pooler identified. Jenne testified he knew that criminal defendants often don't tell their attorneys and investigators the full truth, and he made an effort to corroborate all the information Pooler gave him.

Importantly, Salnick and Jenne testified that they tried to get these records Pooler claims they should have obtained. Salnick testified they tried to get Pooler's military records, but were unsuccessful. Jenne testified that he made telephone calls and sent letters requesting Pooler's school records, but he was told they were unavailable. Jenne tried to get Pooler's employment records also, and did get the ones from local employers, but could not obtain the records from Louisiana.

When Salnick and Jenne could not get the requested records, they sought alternative corroboration from Pooler's close relatives, who could reasonably be expected to know the details of Pooler's background. Only after they obtained that corroboration did they present the evidence at trial.

It was not unreasonable, or contrary to Supreme Court precedent, for the Florida Supreme Court to find that counsel's performance as to these records was not deficient under Strickland. Salnick and his investigator Jenne did try to get the corroborating records, and when they could not, they tried to—and did—obtain confirmation through other means. See Housel v. Head, 238 F.3d 1289, 1295–96 (11th Cir. 2001) (counsel's failure to discover and present evidence of defendant's poor, abusive upbringing was not deficient performance because defendant told counsel there was nothing traumatic in his upbringing, counsel followed up by interviewing defendant's mother and other witnesses, and mother confirmed that upbringing was normal); see also Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1210–12 (11th Cir. 2007) (attorney's performance not unreasonable for not finding, and providing to expert, evidence of defendant's childhood abuse because (1) defendant failed to mention abuse and in fact told attorney "just the opposite," and (2) attorney interviewed a number of family members, none of whom mentioned abuse and all of whom said that defendant's childhood was "harmonious and happy" (brackets omitted)); Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) (attorney's performance not unreasonable for not finding evidence of defendant's childhood abuse and mistreatment where defendant himself gave no reason to suspect abuse or mistreatment, and where attorney spoke to defendant's mother and "got nothing from her about [the defendant] having been

40

abused or mistreated"). That the information Pooler gave his counsel—and the confirmation supplied by Pooler's closest relatives—turned out to be false is of no moment, for we do not judge counsel's performance by hindsight. See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Significantly, Pooler presents no evidence, other than the fact that his 3.850 counsel obtained the records and trial counsel did not, tending to show that the efforts trial counsel actually made to try to get the records were unreasonably deficient. See Lambrix v. Singletary, 72 F.3d 1500, 1505–06 (11th Cir. 1996) (rejecting ineffective assistance claim for failure to discover evidence of defendant's childhood abuse and neglect where there was "no indication that [defendant or his] relatives gave counsel reason to believe that such evidence might exist" and there was no "documentary evidence of [defendant's] abuse or neglect that would have been readily available to counsel at the time" (emphasis added)).

As noted above, the reasonableness of an attorney's investigative decisions "depends critically" upon information the defendant furnishes to his counsel. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. Moreover, "searching for old records can promise less than looking for a needle in a haystack, when a lawyer

41

truly has reason to doubt there is any needle there." Rompilla v. Beard, 545 U.S. 374, 389, 125 S. Ct. 2456, 2467 (2005).

This is not a case where defense counsel took his client's word on faith, with no attempt at confirmation.[11] See, e.g., Porter v. McCollum, 558 U.S. 30, —, 130 S. Ct. 447, 452–53 (2009) (concluding penalty-phase counsel performed deficiently when he had only one short meeting with defendant about mitigating evidence; did not interview any family members; did not obtain any school, medical, or military records; presented almost no mitigating evidence; and left jury hardly knowing anything about defendant). Nor is it a case where counsel ignored evidence in his possession that cast doubt upon his client's story or suggested the need for further investigation. See Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 2538 (2003) (stating that "[i]n assessing the reasonableness of an

---

[11]Even if it were, that does not necessarily mean that the Florida Supreme Court's decision finding no deficient performance would be unreasonable. See, e.g., Callahan v. Campbell, 427 F.3d 897, 934 (11th Cir. 2005) ("Especially when it comes to childhood abuse, information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate. This Court has already stated in no uncertain terms: 'An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.'" (citations, quotation marks, and brackets omitted)). Pooler, though, citing Rompilla v. Beard, 545 U.S. 374, 377, 125 S. Ct. 2456, 2460 (2005), contends that "even when the defendant and/or his family suggest that no mitigating evidence is available, defense counsel has an absolute duty to investigate." This argument misconstrues (and goes well beyond) the limited holding of Rompilla, which provides that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." Id. (emphasis added).

42

attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further," and finding that "[i]n light of what the . . . records [discovered by counsel] actually revealed, . . . counsel chose to abandon their investigation at an unreasonable juncture"); Middleton v. Dugger, 849 F.2d 491, 493–94 (11th Cir. 1988) (stating attorney's performance was deficient because he "conducted almost no background investigation, despite discussions with [the defendant] concerning the existence of such mitigating evidence").

Instead, this is "a case, like Strickland itself, in which defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'" Johnson v. Upton, 615 F.3d 1318, 1338 (11th Cir. 2010). It was neither unreasonable nor contrary to existing Supreme Court holdings for the Florida Supreme Court to conclude Salnick's performance was not deficient despite not successfully obtaining Pooler's records to supplement the information given to experts.

## C.    Performance: Mental Health Experts

Pooler also argues that Salnick's performance was unreasonably deficient because he relied on the court-appointed experts who evaluated Pooler and did not

43

retain other mental health experts to evaluate Pooler.  The record reveals that this was a conscious, strategic decision by Salnick, one that the Florida Supreme Court expressly found to be reasonable.  Pooler II, 980 So. 2d at 469.  Salnick testified that he had "a bunch" of strategic reasons for choosing to rely, in the penalty phase, on Dr. Levine and Dr. Alexander, including that they would be more credible to the jury because they were hired by the court and not the defense team.  Salnick also said that he did not hire a defense mental health expert to do a mitigation-related evaluation because of what he already had for the penalty phase.  Salnick believed Dr. Levine's and Dr. Alexander's conclusions dovetailed with his chosen penalty-phase strategy of presenting evidence that would humanize Pooler and portray him as a man who worked hard, served his country, and was good to his family.

Under the particular circumstances here, it was neither unreasonable nor contrary to Supreme Court precedent for the Florida Supreme Court to conclude that a reasonable attorney could have decided, as Salnick did, to rely on the two experts here.  Those circumstances include the facts that: (1) trial counsel was already performing a mitigation investigation into Pooler's background, including an inquiry into his medical and psychological history; and (2) well before trial, counsel read the reports from, and heard the competency-hearing testimony of, multiple experts who had evaluated Pooler's then-current mental functioning.  And

44

most importantly, nothing in those expert reports during competency proceedings, or in the additional mitigation search Salnick and Jenne performed, suggested a need for mental health experts to look further.  See Newland v. Hall, 527 F.3d 1162, 1210–14 (11th Cir. 2008) (finding no deficient performance in counsel's failure to hire independent mental health expert after (1) court-appointed competency experts evaluated defendant and reported he was not suffering from psychological defect at time of murder, and (2) counsel's observations of defendant showed nothing indicating mental illness).  Here, the two experts administered neuropsychological and intelligence tests and reported that Pooler had: (1) a low-average to borderline intelligence level, with an overall IQ around 80; (2) poor reading ability; (3) sub-optimal attention functioning; (4) no prior psychiatric treatment except for the treatment for depression after his arrest; (5) possible hypothyroidism and psychomotor retardation; (6) suffered head trauma 30 years before in a car accident, but with no cognitive or thinking ability changes following it; (7) intact memory function, with no delusions or confusion; (8) no evident symptoms of mental illness; and (9) no signs of long-term mental illness or disturbance existing at the time of Brown's murder.[12]  The two experts inquired

---

[12]Dr. Silversmith believed Pooler had a personality disorder of an unspecified type, either antisocial or passive dependent (although Dr. Alexander saw no sign of a personality disorder), plus an unspecified, non-psychotic mental disorder to which Pooler's pretrial incarceration may have contributed.  Thus, this also was not unknown to Salnick.

about Pooler's history and background, and Dr. Levine in particular spent about eight hours examining Pooler.

Armed with Dr. Levine's and Dr. Alexander's reports of Pooler's cognitive functioning and emotional state, and added to what Salnick had learned of Pooler's background (his family life, military service, and regular employment), the Florida Supreme Court could reasonably conclude that Salnick's strategic choice—to eschew further mental health evaluations and emphasize Pooler's positive qualities—was not constitutionally deficient performance.  See Housel, 238 F.3d at 1296 (finding no deficient performance in counsel's failure to investigate and present mental health evidence of brain damage and hypoglycemic irritability episodes because (1) counsel reviewed two psychological evaluations that did not suggest a need to investigate further, (2) the defendant never mentioned his hypoglycemia to counsel, (3) counsel knew about defendant's prior head injury but saw nothing unusual in defendant's behavior, and thus, (4) counsel "knew enough about [the defendant's] mental health reasonably to conclude that further investigation would not bear fruit"); see also Newland, 527 F.3d at 1213–14.

## D.    Performance: Alcohol Use

Pooler also argued that Salnick performed unreasonably because he failed to follow up on information about Pooler's nephew Brian Warren and Pooler's alleged use of alcohol on the day of the murder.  As to this contention, the Florida

Supreme Court decision was likewise reasonable and not contrary to prior holdings of the United States Supreme Court.

Regarding Brian Warren, it is undisputed that Salnick and Jenne interviewed a number of Pooler's relatives, including Pooler's father, brother, and sister, and that Jenne spent three days in Louisiana speaking with persons who knew Pooler.[13] As the Supreme Court has recognized, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." Bobby v. Van Hook, 558 U.S. 4, —, 130 S. Ct. 13, 19 (2009).

Regarding Pooler's alcohol consumption, the record shows that Salnick investigated and was in fact aware of this evidence. Salnick and Jenne interviewed a number of witnesses, including Pooler's relatives and employers, about Pooler's use of alcohol. Salnick obtained the police report about the theft Pooler reported on the day of the murder—which said Pooler "fell asleep due to intoxication"—

---

[13]Jenne may have spoken with Pooler's nephew Darren Warren, too. Jenne's invoice shows a phone call placed to Darren Warren on April 25, 1995. However, Darren Warren's declaration states that he was never contacted by Pooler's defense team. Because Darren Warren did not testify at the 3.850 hearing and Jenne was not asked about the phone call, a factual dispute remains.

and spoke to Pooler about it.[14]  Pooler told Salnick that the woman who allegedly robbed him was a prostitute, and Salnick did not want to open the door to that fact coming before the jury, stating that "[t]here is no way I would have done that.  I just didn't think it was appropriate."

More generally, presenting evidence of Pooler's alcohol use may not have been mitigating in the jury's eyes, and may well have opened the door not only to evidence of Pooler's cavorting with a prostitute hours before he brutally killed his ex-girlfriend, but also to the abundant evidence of Pooler's bad temper and propensity to violence when he was drunk.  See Housel, 238 F.3d at 1298 (stating counsel "could reasonably have decided to avoid using evidence of [defendant]'s intoxication on the night of the offense and his history of substance abuse" because "[e]vidence of drug and alcohol abuse is 'a two-edged sword,' and a lawyer may reasonably decide that it could hurt as much as help the defense" (citation omitted)); Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 934–35 (11th Cir. 2011) (noting counsel may fail to investigate line of mitigating evidence because of "strategic purpose" of "avoiding the possibility of opening the door to what could be harmful evidence"); see also Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir 2010) (observing that evidence of alcohol abuse "is often a 'two-edged sword'"

---

[14]Salnick even discussed with Pooler the possibility of plying a voluntary intoxication defense in the guilt phase, but rejected that option because Pooler was adamant that he did not want to use a defense that involved admitting he committed the crimes.

that may have caused some jurors to vote for death); Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001) (concluding alcohol-abuse evidence could have been harmful); Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) (same); Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996) (same).  In any event, the alcohol evidence was inconsistent with Salnick's penalty phase strategy of generating a measure of sympathy for Pooler and showing him to be a good friend and family man, a military veteran, and a productive, employed member of society. See Housel, 238 F.3d at 1296 (finding reasonable counsel's choice to employ a humanizing penalty phase strategy that emphasized the defendant's "family-friendly side" instead of presenting evidence of his intoxication on the night of the murder).

Accordingly, the Florida Supreme Court's rejection of this allegation of deficient performance, as with the others, was reasonable and consistent with existing Supreme Court precedent.

## E.    Prejudice

Likewise, Pooler has not met his burden under AEDPA of showing that the Florida Supreme Court's finding that Pooler was not prejudiced was (1) contrary to prior Supreme Court holdings, (2) based on an unreasonable application of prior Supreme Court holdings, or (3) based on an unreasonable determination of the facts in light of the evidence presented in state court.

49

Much of the 3.850 evidence Pooler claims his trial counsel Salnick should have presented in the penalty phase was not mitigating but aggravating, or else would have opened the door to the introduction of aggravating evidence that would have diluted its impact.  See Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1246 (11th Cir. 2010) ("The probability of proposed mitigating evidence opening the door to strong aggravating evidence is an important factor to consider in assessing the reasonable probability of a different sentencing result."); Wood v. Allen, 542 F.3d 1281, 1313 (11th Cir. 2008), aff'd, 558 U.S. 290, 130 S. Ct. 841 (2010) ("[W]e have rejected prejudice arguments where mitigation evidence was a 'two-edged sword' or would have opened the door to damaging evidence."); see also Suggs, 609 F.3d at 1231–33; Grayson, 257 F.3d at 1227–28; Waldrop, 77 F.3d at 1313.  For example, the school records contain repeated negative comments about Pooler's diligence, conduct, and attendance.[15]  The military records show that Pooler was frequently disciplined for offenses, mostly absences without leave, and was found guilty in a court-martial for using disrespectful language to a superior officer and for refusing to obey orders and suffered a reduction in rank.  And the 3.850 evidence includes numerous instances of Pooler displaying a bad,

---

[15]Pooler's school records contain notes such as, "Leroy stays out of school too much," "School doesn't seem to interest Leroy," he is "very slow . . . [and] plays and talks while in class," he "is very mischievous, stays out of school playing hooky," and he "could do much better."

50

violent temper: (1) nephew Brian Warren said that Pooler "became violent and had a hard time controlling his temper"; (2) Brian Warren was "actually physically afraid of" Pooler in the time period leading up to Brown's murder, and Darren Warren also said that Pooler's behavior was frightening; and (3) Pooler, while drunk, told Brian Warren he would kill Brown and several times told Brown that he would kill her. Salnick too testified that he had discovered evidence that Pooler had a bad temper, a violent background, and was known to argue with people and carry a gun.[16] Admitting such testimony would have negated Salnick's successful attempt at keeping this harmful information from the jury.

Other 3.850 evidence Pooler claims Salnick should have presented was merely cumulative to evidence Salnick already put on. Brian and Darren Warren testified that Pooler tried to be a good father to his four daughters, but Pooler's other family members testified to that in the penalty phase. Dr. Brannon's testimony (e.g., that Pooler had borderline intelligence, poor reading ability, and neuropsychological deficits) echoed what was already presented through Dr.

---

[16]For instance, Pooler's supervisor Carlton Weeks testified that Pooler was ill-tempered and aggressive, that people did not want to work with him, that he seemed to be a violent person, and that Weeks knew of one instance in which Pooler brandished a gun during an argument.

Levine and/or Pooler's family members.[17]  And Pooler's trial counsel already presented evidence of Pooler's military service in Vietnam.  "Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial."  Rose v. McNeil, 634 F.3d 1224, 1243 (11th Cir.), cert. denied, 132 S. Ct. 190 (2011).

What remains when the damaging and cumulative 3.850 evidence is stripped away is fairly weak.  In short, when we consider all the evidence—what was presented at trial and in the 3.850 proceeding—we conclude that there is no reasonable probability that Pooler would have received a life sentence instead of death.  More to the point, we conclude that the Florida Supreme Court's decision that Pooler did not satisfy Strickland's prejudice prong was not contrary to Supreme Court precedent, did not unreasonably apply Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the state-court evidence.

## F.    Pooler's Reliance on Porter

We also reject all of Pooler's arguments that are based on Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447 (2009).  First, we point out that the

---

[17]In fact, notwithstanding Pooler's arguments that Salnick's performance was deficient for not obtaining a mitigation-specific expert evaluation of Pooler, Dr. Brannon conducted such an evaluation and found little that was not already noted by the several competency experts.

Supreme Court's 2009 <u>Porter</u> decision was after the Florida Supreme Court's 2008

decision in <u>Pooler II</u>, and thus <u>Porter</u> itself does not constitute clearly established

federal law for § 2254(d) purposes for Pooler's case.  Thus, the issue is not

whether the Florida Supreme Court's decision in <u>Pooler II</u> was contrary to or an

unreasonable application of <u>Porter</u>, but whether the Supreme Court's decision in

<u>Porter</u> illustrates that the Florida Supreme Court unreasonably applied <u>Strickland</u>

or some other pre-<u>Pooler II</u> holding of the United States Supreme Court.

Second, and in any event, the factual differences between the two cases—as

to both the performance and prejudice prongs of the ineffective-counsel analysis—

are substantial and numerous.  For example, Porter's counsel at the penalty phase

called only one witness (Porter's ex-wife) and presented almost no mitigating

evidence at all.  <u>Porter</u>, 130 S. Ct. at 449.  The penalty phase evidence "left the jury

knowing hardly anything about [Porter] other than the facts of his crimes."  <u>Id.</u>

By contrast, Pooler's counsel Salnick called four mental health experts

(neuropsychologist Levine, psychologist Alexander, and jail psychiatrists

Desormeau and Armstrong), jail officer Arthur Rock, Pooler's friend and co-

worker Alice Bradford, and three of Pooler's family members (his brother, sister,

and father).  These witnesses told the jury, among other things, that Pooler: (1) had

an IQ around 80, in the low-average to mildly impaired range, and a third-grade

reading level; (2) suffered depressive symptoms in jail, but behaved well there; (3)

was a reliable and punctual employee of the same employer for seven years; (4) helped Bradford, a single parent, with yard work; (5) was nice, polite, and respectful to Bradford and she trusted him around her son; (6) grew up in a close, supportive, religious family; (7) was a good father to his four daughters; (8) served more than six years in the United States Marine Corps, including service in Vietnam; and (9) had problems, including temper problems, after he returned from Vietnam. The jury heard much that would humanize Pooler, but nevertheless recommended that Pooler receive the death penalty.

Third, Porter materially differs from the instant case because in Porter, the Supreme Court decided the performance prong de novo, without AEDPA deference. See id. at 452. And Porter's trial counsel's penalty-phase preparation was plainly deficient. As the Supreme Court noted, Porter's counsel: (1) "had only one short meeting with Porter regarding the penalty phase"; (2) did not interview Porter's family members; (3) did not ever request Porter's school, military, and medical records; (4) ignored avenues of investigation revealed by the court-ordered competency evaluations, which "reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's 'over-discipline'"; and (5) told the jury that "Porter was not 'mentally healthy'" but did not present any mental health evidence. Id. at 449, 453 (brackets omitted). Here, not only do we have a decision of the Florida Supreme Court on

54

counsel's performance to which we must defer under AEDPA, but the evidence recounted above demonstrates that trial counsel Salnick investigated mitigating evidence much more thoroughly and presented much more of what he found.

Further, as to prejudice, the mitigating evidence adduced in Porter's 3.850 proceedings was far more powerful than that present here. In Porter, unlike this case, there was evidence of extensive childhood physical abuse: Porter's father routinely beat Porter's mother in Porter's presence, despite Porter's attempts to protect her, and Porter himself was a "favorite target" of his father's abuse. Id. at 449. Porter's father beat Porter and, at least once, shot at him with a gun. Id. According to Porter's siblings, Porter's father "was violent every weekend." Id. Porter's case also featured expert testimony that Porter had brain damage, which is not present in this case. Id. at 451.

Additionally, Porter's 3.850 hearing featured detailed and moving testimony about Porter's military service from Porter's company commander. Id. at 450. This testimony revealed that: (1) Porter enlisted in the Army at age 17 and served in the Korean War; (2) at the battle of Kunu-ri, Porter's unit fought in bitter cold, with little or no food or sleep through five days of combat, all of which Porter endured while having a gunshot wound in his leg; (3) Porter's unit then "engaged in a 'fierce hand-to-hand fight'" with the enemy before finally receiving permission to withdraw; (4) less than three months later, Porter fought at the battle

55

of Chip'yong-ni, during which Porter's regiment "was cut off from the rest of the Eighth Army and defended itself for two days and two nights under constant fire"; (5) Porter's company was ordered to charge the enemy's defensive positions on high ground, during which the company came under heavy mortar, artillery, and machine gun fire; (6) Porter's company suffered more than 50% casualties in the battle, and Porter himself was wounded again; and (7) for his wartime military service, Porter was awarded two Purple Hearts, the Combat Infantryman Badge, and other decorations, and his unit received the Presidential Unit Citation for its performance at Chip'yong-ni. Id. at 449–50.

In contrast, Pooler's 3.850 proceedings produced no evidence of childhood physical abuse and much less detailed evidence of Pooler's wartime service in Vietnam. Pooler's military records did show that he participated in counter-insurgency and combat operations and was awarded three basic service medals. But no one with first-hand knowledge of Pooler's wartime service testified on his behalf either at trial or in the 3.850 proceedings.[18]

And Pooler's military records show that he was frequently the subject of military discipline. While both Porter and Pooler were disciplined for being absent

---

[18]As to adjustment problems after wartime, the Supreme Court noted that "Porter's expert testified that [Porter's] symptoms would easily warrant a diagnosis of posttraumatic stress disorder." Porter, 130 S. Ct. at 450 n.4. Pooler's 3.850 expert Dr. Brannon, however, could not say whether Pooler's symptoms actually rose to the level of PTSD.

without leave ("AWOL"), Pooler's infractions were more numerous and serious. Porter went AWOL twice while in Korea—for which he was not punished at all because unauthorized absences in the field were not uncommon occurrences in wartime and sometimes were unintentional—and once back in the United States in order to see his son. Id. at 450 & n.3. Pooler, on the other hand, was found AWOL six times in one year, and was also punished for using disrespectful language to a superior officer and for refusing to obey orders. As the Florida Supreme Court noted in Pooler II, "Pooler's military records revealed that he was charged with at least nineteen different offenses on fifteen different occasions between October 1969 and February 1971 and that he was court-martialed for several of these offenses." Pooler II, 980 So. 2d at 467.

Therefore, Porter presented a far more mitigating evidentiary profile than this case does. In Porter, the penalty-phase jury heard almost nothing of Porter except his crimes, but could have—and should have—been presented with persuasive evidence of Porter's extensive childhood abuse, his potential brain damage, and his heroic military service under horrific conditions, which left him physically and mentally wounded. In Pooler, though, the jury already heard about Pooler's close family life; his low intelligence; his being a good father, friend, and employee; and his voluntary service in the Vietnam War and its negative effect on him. And Pooler's counsel successfully kept the jury from hearing significant

57

<u>negative</u> evidence that was later adduced in the 3.850 proceedings and that is not present in <u>Porter</u>: for example, that Pooler was aggressive and short-tempered, that most of his co-workers did not want to work with him, that Pooler was known to carry a gun and brandish it during arguments, that Pooler spent time with a prostitute hours before murdering his ex-girlfriend Brown, that Pooler was frequently disciplined in the Army, that Pooler was an indifferent student, and that Pooler's own family members were afraid of him when he drank, which was frequently.

Simply put, <u>Porter</u> does not show that the Florida Supreme Court in <u>Pooler II</u> unreasonably applied <u>Strickland</u> or any other pre-existing United States Supreme Court holding. [19]

## IV.  CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Pooler's § 2254 petition.

**AFFIRMED.**

---

[19]Pooler also relies on <u>Sears v. Upton</u>, — U.S. —, 130 S. Ct. 3259 (2010), but that case is materially different, too.  Sears's counsel performed only a cursory mitigation investigation and presented evidence only about the defendant's middle-class upbringing and the potential effect of a death sentence on his family. <u>Id.</u> at 3261–62.  Counsel failed to discover, or present, <u>any</u> evidence about the defendant being abused as a child or his substantial cognitive impairments. <u>Id.</u> at 3262–64.  And most importantly, the <u>Sears</u> Court <u>did not conclude</u> that the defendant had satisfied the <u>Strickland</u> prejudice prong. <u>Id.</u> at 3267.  It merely found that the state court misapplied <u>Strickland</u> and remanded for further proceedings.  <u>See id.</u> ("It is for the state court . . . to undertake this [<u>Strickland</u> prejudice prong] reweighing in the first instance.").