[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 10, 2009
THOMAS K. KAHN
CLERK

No. 08-15254

_____

D.C. Docket No. 04-02866-CV-KOB-PWG

MICHAEL JEFFREY LAND,

Petitioner-Appellant,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,
STATE OF ALABAMA ATTORNEY GENERAL,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 10, 2009)

Before DUBINA, Chief Judge, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Michael Jeffrey Land appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition in which he sought to overturn his conviction and death sentence for the murder of Candace Brown.

Regarding the conviction, he argues that his habeas petition should be granted because: (1) an incriminating statement, allegedly made as a result of police coercion, was admitted at trial in violation of the Fifth and Fourteenth Amendments; (2) the trial court violated Land's due process rights when it instructed the jury that the incriminating statement was made voluntarily, thereby tainting the jury's ability to fulfill its duty of reaching a credibility determination regarding that statement; (3) the prosecutor violated Land's right to a fair trial by arguing facts unsubstantiated by the record; and (4) his Sixth Amendment right to effective assistance of counsel was violated when his defense attorneys failed to object to the prosecutor's factually unsubstantiated arguments.

With reference to his death sentence, Land claims that his counsel were constitutionally ineffective during sentencing for failing to reasonably investigate and present mitigation evidence.

The district court considered these arguments and found no merit. After careful consideration of the parties' briefs and oral argument, we affirm.

## BACKGROUND

The police were called to Brown's house after her landlord found that a window had been broken and the telephone wires had been cut. Upon entering the house, the police had discovered Brown's unharmed two-year-old child, a note on a bulletin board with Land's name and phone number, and a shoe print with distinctive tread (spelling out "USA") on one of the broken windowpanes. They then located Land, who agreed to accompany them to the police station for questioning. He was given his Miranda rights, signed a waiver-of-rights form and agreed to have his statement tape recorded.

Land initially claimed not to have seen Brown for a week and provided an alibi to account for the time relevant to Brown's disappearance. During the course of the interview, one detective noticed what appeared to be bloodstains on Land's shoes and asked to inspect them. The detective saw that the tread on his shoes seemed to match the "USA" print on the windowpane at Brown's house and took them for further analysis. Land also complied with a request to change into a jail jumpsuit so his clothes could be inspected for bloodstains. During this period, the police contacted Land's alibi witness, who did not substantiate his story.

The police then confronted Land about the evidence, his inconsistencies, and the lack of corroboration from his alibi witness, telling him he needed to be truthful. He was again informed of, and waived, his Miranda rights. He proceeded

3

to give another statement to the police which was <u>not</u> recorded (hereafter his "second statement").[1] This time he said he met two men at a service station who asked him if he knew an "easy mark" for a burglary. He suggested Brown's home and the men paid him $20 to cut the window glass of her residence, after which they all entered the kitchen. During the burglary, Brown woke up from the commotion and appeared in the kitchen, where one of the two men knocked her to the floor. Land claimed he became frightened at this point and left. He also admitted in this second statement that he had lied previously about where his car was and informed the detectives it could be found at the mall where he worked. The detectives then formally arrested Land.

The next day Brown's body was discovered near her residence. She had been shot in the back of her head by a .45 caliber automatic handgun. A search of Land's car turned up a .45 handgun, and the bullet from her head matched a bullet test-fired from that gun. They also found wire-cutters and a pair of gloves that had imbedded glass fragments consistent with the glass of the broken window in Brown's house. A DNA profile made from a semen stain, which was found on Brown's blouse, matched Land's blood sample with a degree of certainty of

---

[1] At the suppression hearing and at trial, the detectives testified that Land initially made this statement to one detective, who did not record it. The detective then asked if they could record the statement but Land refused, citing his concern that he was admitting to burglary. Land did not refute this testimony.

4

roughly one in 20 million.

Land was convicted and sentenced to death in Alabama state court for two counts of capital murder—murder during burglary and murder during kidnapping. His conviction and sentence were affirmed by the Alabama Court of Criminal Appeals, Land v. State, 678 So. 2d 201 (Ala. Crim. App. 1995), and the Alabama Supreme Court, Ex parte Land, 678 So. 2d 224 (Ala. 1996). The U.S. Supreme Court denied Land's petition for writ of certiorari. Land v. Alabama, 519 U.S. 933 (1996). Land then filed a post-conviction petition in state court pursuant to Alabama Rule of Criminal Procedure 32. After conducting an evidentiary hearing, the trial court denied Land's Rule 32 petition and the Alabama Court of Criminal Appeals affirmed. The Alabama Supreme Court then denied his petition for writ of certiorari. Having lost on all his state court appeals, Land filed a writ of habeas corpus in federal district court, which was also denied. He was then granted a certificate of appealability on five issues, and we now review the district court's denial of his federal petition based on those claims.

## STANDARD OF REVIEW

Our review of Land's habeas petition, which was filed after April 24, 1996, is limited by the terms of 28 U.S.C. § 2254 as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). See Williams v. Taylor, 529 U.S. 362,

402–03 (2000).  In this case, the state court adjudicated on the merits all of the

issues Land presents so we must apply AEDPA's deferential standard of review.[2]

That is, we may grant habeas only in those cases where the state court's decision

"was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding," § 2254(d)(2), or "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," § 2254(d)(1).  The

Supreme Court has further clarified this latter requirement as follows:

> Under the "contrary to" clause, a federal habeas court may grant the

---

[2] Land argues that the district court should not have applied § 2254(d)'s deferential standard of review on two of his claims—the erroneous jury instruction and the prosecutorial misconduct—because it incorrectly found that the state court had adjudicated them on the merits. Land asserts it should have instead applied de novo review to these claims as the Alabama Supreme Court did not explicitly rule on them despite his raising the issues.  We disagree.  The Alabama Supreme Court stated in its opinion that

> Land has raised for this Court's review 23 issues, some of which were also raised before the Court of Criminal Appeals and discussed in that court's lengthy opinion.  We have thoroughly reviewed the issues raised before the Court of Criminal Appeals, and we find no error in the opinion of that court.  We have also thoroughly reviewed the additional issues Land has raised for the first time before this Court and have found no reversible error.

Ex parte Land, 678 So. 2d at 230.  While not explicitly addressing the claims, the Alabama Supreme Court's statement is sufficient to qualify as having adjudicated them on the merits.  We have previously held that "[t]he statutory language [of § 2254] focuses on the result, not on the reasoning that led to the result . . . . [A]ll that is required is a rejection of the claim on the merits, not an explanation."  Wright v. Sec'y for Dept. of Corrections, 278 F.3d 1245, 1255 (11th Cir. 2002) (finding the summary state appellate court order in Wright v. State, 536 So. 2d 1072 (Fla. 4th DCA 1988), —"[w]e affirm the convictions and life sentences imposed thereon for count I and count II"—was sufficient to receive § 2254(d) deference).  Thus, the district court was correct in finding that the state court had adjudicated each claim on the merits.

writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412–13.  We now turn to Land's arguments applying this standard of review.

**DISCUSSION**

1. The Admission of Land's Second Statement Did Not Violate the Fifth and Fourteenth Amendments

Land claims that his incriminating second statement was made involuntarily because it was coerced by the police officers, who created a threatening atmosphere in the interrogation room.[3]  Under Federal law, a confession is deemed involuntary if the "[speaker's] will was overborne in such a way to render his confession the product of coercion."  Arizona v. Fulminante, 499 U.S. 279, 288 (1991).  In making this determination, a court must consider the totality of the surrounding circumstances and ensure that the State has met its burden of demonstrating by a preponderance of the evidence that the confession was a result of voluntary choice.  Lego v. Twomey, 404 U.S. 477, 489 (1972).

---

[3] Land does not contest that he waived his Miranda warnings again before the second statement.

7

The district court, applying AEDPA deference, found that the state court's conclusion that Land's confession was voluntary was not an unreasonable determination of the facts in light of the testimony presented at the suppression hearing and at trial, nor was it contrary to, or an unreasonable application of, clearly established Federal law.

As an initial matter, Land argues that AEDPA deference is inappropriate with regard to the state court's legal conclusion that the statement was voluntary, citing Miller v. Fenton, in which the Supreme Court held that "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." 474 U.S. 104, 112 (1985). Recognizing that Miller predated the recent AEDPA provisions, Land claims that AEDPA did not alter the standard of review that Miller established, relying on a post-AEDPA Fifth Circuit case. See ShisInday v. Quarterman, 511 F.3d 514, 522 (5th Cir. 2007) (noting that the defendant "is correct that the voluntariness of a confession is a matter for independent federal determination" but that "subsidiary factual questions . . . are entitled to the § 2254(d) presumption") (quotation and citation omitted).

We agree that we must independently ascertain and apply Federal law to

8

determine whether the challenged statement was obtained in accordance with the Constitution. However, we do so as a first step in order to ultimately determine whether the state court's finding that Land's statement was voluntary was contrary to, or an unreasonable application of, that law. See, e.g., Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002) ("The ultimate issue of voluntariness is a legal question requiring an independent federal determination. Thus, under the AEDPA habeas standard, we are required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent.") (internal citation omitted).

Turning to the substance of Land's coercion claim, we first note that he did not testify in state court in connection with the motion to suppress, therefore the testimony of the three officers regarding the circumstances of the second statement is unrefuted. Nonetheless, Land argues that the police testimony itself supports a conclusion that his statement was coerced, pointing to the following facts elicited at trial: When Land commenced his second statement, the police had taken his shoes and clothes, and he was in an orange jumpsuit and barefoot. He changed positions often during the interview, at certain points curling himself up into "a semi-fetal position" with his feet pulled up onto the chair and his hands covering his face. At one point, one officer took Land's wrist and moved his hand away

9

from his head, saying something to the effect of "Boy, look up at me when I talk to you." This officer also acknowledged that "Mr. Land was probably frightened of [him]." Finally, Land argues that the simple fact that the statement was unrecorded suggests that it was the police who chose not to record it in order to avoid having an objective account of the events.

The officers, however, all provided direct testimony describing the circumstances surrounding Land's statement. They each testified that Land was not threatened in any way. One officer said he perceived Land's behavior as simply trying to avoid the questions and that Land's changes in position were not the result of any touching or any other conduct by the officers. Furthermore, nothing in the record suggests that the change of clothes and the confiscation of his shoes were attempts to humiliate Land; on the contrary, it appears unrefuted that this was done solely so that further forensic analysis could be undertaken. And, finally, there is nothing in the record to refute the detectives' testimony that it was Land who requested that the statement not be taped.

Taking into account the totality of the circumstances, the trial court found that Land's body language indicated an aversion to the questions rather than a fear of the questioner and that his will was not "overborne." Land attempts to rebut the trial court's finding through inference and implication, relying primarily on the

10

theory that the body language that the police described simply could not be consistent with a voluntary statement. These ex post explanations of his own behavior in the interrogation room, standing alone, are not enough to counteract the weight of the officers' unrefuted testimony and we cannot say that the state court erred in crediting their testimony.

We find that the conclusion that Land's statement was voluntary is not an unreasonable determination of the facts in light of the evidence presented, nor is it contrary to, or an unreasonable application of, clearly established Federal law.

## 2. The Trial Court Did Not Violate Land's Due Process Rights When it Instructed the Jury That His Incriminating Statement Was Voluntary

Land next asserts that even if the state trial court did not err in finding his second statement voluntarily given for purposes of admitting the statement into evidence, the court nonetheless violated his due process rights by instructing the jury that the second statement was made voluntarily, because the instruction tainted the jury's analysis of the credibility of that statement. The trial judge gave the following instruction:

> With regard to the alleged statements made by the defendant to the officers, whether we are talking about the recorded statement or the alleged unrecorded statement, you should know that you may consider all of the facts and circumstances surrounding the taking of the statement in determining the weight or credibility that you give to the statement.

11

In exercising your exclusive prerogative of determining the credibility of the evidence or the weight to which the evidence is properly entitled, you people may consider the circumstances under which the statement or statements were obtained, including the situation and the mutual relation to the parties.

I determine the voluntariness of the statement, you people determine the weight and credibility of one's statement and may disregard a defendant's statement which is unworthy of belief or in which you entertain a reasonable doubt as to its truth.

(emphasis added). Land argues that this instruction placed him at a severe disadvantage because the defense's theory of the case rested on showing that the statement was a result of police coercion and therefore untruthful, unreliable and not credible. Specifically, he suggests that these instructions were contradictory, conveying that the issue of voluntariness had been resolved and was outside the jury's purview but that, at the same time, the jury still had the right to reject the statement as not credible due to a finding of coercion.

The Supreme Court has made clear that it is

the province or capacity of juries to assess the truthfulness of confessions . . . [and] any evidence relating to the accuracy or weight of confessions admitted into evidence. A defendant . . . [is free] to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness. In like measure, of course, juries [are] at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief.

12

Lego, 404 U.S. at 485–86 (emphasis added);[4] see also United States v. Harper, 432 F.2d 100, 102 (5th Cir. 1970)[5] (noting that "the fairest method for determining the voluntariness of a confession" is for the judge to "permit[] the confession and the question of voluntariness to go to the jury, after having made his own preliminary determination that there was no taint of compulsion but without indicating his evaluation to the jury") (emphasis added).

The heart of the matter, then, is whether one can truly "familiarize a jury with . . . facts bearing upon . . . voluntariness," Lego, 404 U.S. at 486, if the trial court explicitly tells the jury it has already found the statement to be voluntary without further explication of this concept. Given that the trial court had stated it found the statement was made voluntarily and that a credibility determination would be based on the same coercion evidence, the jurors may have been under the

---

[4] Although 18 U. S. C. § 3501 (a) is inapplicable to this case, it helps to illuminate the scope of the voluntariness instruction vis-a-vis Federal law:

> (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. . . . If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(emphasis added).

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

belief that they were de facto compelled to find the statement credible. "The proper standard for reviewing such claims [of constitutionally defective jury instructions] is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Jones v. United States, 527 U.S. 373, 390 (1999) (quotations omitted). Here, we believe that there is a reasonable likelihood that the jury would apply the given instruction in such a way that it would not feel like it could make an independent determination of the credibility of the statement, in violation of the Supreme Court's dictates in Lego. As such, we find that a decision upholding this instruction, as given, is contrary to, or an unreasonable application of, clearly established Federal law.

However, only if "the ailing [jury] instruction by itself so infected the entire trial [will] the resulting conviction violate[] due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (emphasis added) (quotations omitted). While it is quite possible the instruction was confusing, we do not think it so infected the entire trial as to warrant habeas relief. See, e.g, United States v. Bear Killer, 534 F.2d 1253, 1259 (finding that while the judge erred in instructing the jury the statement was voluntary, "the erroneous instruction was harmless and did not have a substantial influence on the jury's verdict of guilty in this cause"). Viewing the set of jury instructions in its entirety, of which the voluntariness portion was but a small part,

14

and given all the available evidence and arguments presented to the jury, we cannot say that the addition of the offending clause had a "substantial influence on the jury's verdict of guilty." Id.

### 3. The Prosecutor Arguing Facts Outside the Record Did Not Result in a Violation of Due Process

Land next asserts that the prosecutor unconstitutionally argued facts that were not supported by the evidence in the record. Prosecutorial misconduct can be a basis for relief if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotations omitted). In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. Romine v. Head, 253 F.3d 1349, 1369–70 (11th Cir. 2001).

No direct evidence was presented describing the events that took place in Candace Brown's home. Nonetheless, the prosecutor made the following statements at closing:

[Mr. Land] goes in and at some point Candy Brown wakes up and he

15

says you're going with me. She said I'm not going anywhere. Maybe she ran towards the front door, maybe she was trying to get out.  But at one point Michael Jeffrey Land fires the gun and said the next one's for your kid.

I submit to you that at the point Candy Brown pulled her pants on and puts some shoes on and walks out of the house and on the way out Candy Brown did one last desperate attempt to protect her child, she locked the door.

. . . .

[Jeff Land] didn't think nobody was going to find her. But Candy Brown knew, Candy Brown knew somebody would find Michael, the little boy.

[T]here is a phrase in [the Bible], no greater love have one man than to lay down his life for his friend.  And that ladies and gentlemen, is what Candy Brown did for her little boy, she gave up everything that she had, not knowing if it would work. And she gave up everything in the world to save that little boy.  That's exactly what happened.

(emphasis added).  Land argues that these statements were unsubstantiated by any testimony and erroneously made to inflame the passions of the jurors. The district court below found that they were reasonably inferred from the evidence at trial.

We agree with Land that the statements were improper.  This reenactment was not comprised of reasonable inferences from the evidence but rather pure speculation.  No witnesses recounted what was said and we have no way of knowing whether Land threatened the child.  The prosecutor exceeded the bounds of appropriate conduct by claiming to describe exactly what happened, and

16

particularly what was said, with such specificity. Given the context and the evidence on the record, we do not agree with the district court that such evidence could provide a legitimate basis for the prosecutor to assert either what was said or done in the interaction between Land and Brown.

However, the bar for granting habeas based on prosecutorial misconduct is a high one. While we by no means condone the prosecutor's behavior, we are hard-pressed to reach the conclusion that these statements rendered the trial "fundamentally unfair." See Brooks v. Francis, 716 F.2d 780, 788 (11th Cir. 1983) ("[P]rosecutorial misconduct, though outside the bounds of propriety, is not reversible error where it does not render the trial fundamentally unfair.") (citation omitted). As noted earlier, the evidence of guilt was overwhelming, and thus any error was harmless. Therefore, we agree with the district court opinion that it is not contrary to, or an unreasonable application of, Federal law to reach the conclusion that Land's statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." (quoting Darden, 477 U.S. at 181).

Furthermore, because we ultimately find that Land is not entitled to relief based on prosecutorial misconduct, we likewise find that he is not entitled to relief on his claim that defense counsel's failure to object to the prosecutor's statements

17

amounted to constitutionally ineffective assistance of counsel. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Land, however, cannot show prejudice in his defense counsel's failure to object to prosecutorial misconduct that, itself, does not warrant reversal.

### 4. Defense Counsel's Failure to Present Mitigation Evidence at the Penalty Phase of the Trial Did Not Amount to Ineffective Assistance of Counsel

Lastly, Land argues that his defense counsel were constitutionally deficient during sentencing because they failed to investigate and present mitigating evidence regarding Land's abusive childhood and his mental illness.[6] The mitigation evidence actually presented involved the testimony of two witnesses—his mother and grandfather—who, Land now asserts, "simply made naked pleas to the jury that they spare Mr. Land from the death penalty." Land claims that had his attorneys presented all the available mitigating evidence, the

---

[6] Land also challenges his attorneys' failure to retain and present a mitigation specialist. The State argues that this claim is procedurally defaulted because Land failed to raise it during his state post-conviction proceedings. However, as discussed below, Land did present the testimony of psychologist Dr. Katherine Boyer at his Rule 32 hearing. Therefore, we will address this argument to the extent Land is arguing that his attorneys were ineffective for failing to present experts such as Dr. Boyer, whose testimony regarding Land's abusive childhood and mental illness was similar to that which would have been presented by a mitigation expert.

18

jury would not have imposed a death sentence and therefore he was prejudiced.

To establish deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." Wiggins, 539 U.S. at 521 (citing Strickland, 466 U.S. at 687 (quotations omitted). As to the penalty phase of the trial, "we consider whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006).

To establish prejudice, a defendant must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In determining whether a defendant has established prejudice at sentencing, the reviewing court must evaluate "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000) (quoting Williams, 529 U.S. at 397–98).

The bulk of the mitigating evidence presented at the Rule 32 hearing, which Land argues should have been presented at trial, addressed two issues—his childhood upbringing and his mental state. The essence of the testimony by his

19

mother was that her first husband, Land's biological father, ignored him and was abusive towards her. This abuse, which sometimes had occurred in Land's presence, led to their divorce when Land was just over one year old. Her subsequent remarriage a few years later did not provide a loving father figure, as Land's stepfather did not treat him kindly. For example, at times his stepfather would take pictures of Land crying and then show them to him, saying "this is what you look like - a cry baby," and when Land's grandmother died, his stepfather told him he had fifteen minutes to cry in his room and then he had to "straighten up." Testimony was also presented by Land's mother and a friend discussing Land's physical appearance during childhood. This testimony included the fact that Land was born with a club foot, had eyes that were wide apart, and was bullied extensively as an adolescent because he was shorter than his classmates (Land is 5'2" tall as an adult).

The evidence regarding Land's mental state was presented by Dr. Katherine Boyer, who testified that Land met the criteria for an antisocial personality disorder. Dr. Boyer explained that as a young child, Land lived in a "climate of fear" due to his father's domineering personality and that his father had "disrupted Mr. Land's ability to connect with other people, emotionally." Consequently, she said that Land had developed into an emotionally unstable person.

On cross-examination, Land's trial counsel testified that he was sure he had considered introducing evidence regarding Land's broken home but concluded that such evidence was unremarkable because the degree of difficulty in Land's childhood was the same as that suffered by many.[7]

Dr. Boyer also testified on cross-examination that Land's "failure to conform to social norms with respect to lawful behavior" as well as his "deceitfulness, use of aliases or conning others for personal profit or pleasure, [and] impulsivity" were among the characteristics she used to reach her diagnosis. Land's trial counsel further testified that keeping from the jury Land's criminal history, to which Dr. Boyer referred, (which they did successfully), formed an important part of the trial strategy. Thus, not presenting any of the mitigation evidence developed at the Rule 32 hearing appears consistent with trial counsel's defense strategy and would not qualify as objectively unreasonable.

Regardless, however, it is clear that Land cannot meet the prejudice prong. As the state post-conviction court pointed out, many of the facts adduced at the

---

[7] As to the mitigating evidence actually presented at sentencing, defense counsel testified that he chose to put Land's mother on the stand at sentencing because she "made a very good impression" and Land's grandfather because he was "a very, very stately gentleman" who made a "compelling figure." Together, he explained, the two witnesses made an emotional appeal to the jury that caused some of the jurors' eyes to tear up. Although the emotional appeal was ultimately insufficient to avoid Land's death sentence, it was not unreasonable for the state court to conclude, under Strickland, that Land's counsel had made a reasonable tactical decision and was not ineffective in doing so.

21

Rule 32 proceeding—for example, having divorced parents, being picked on at school, and losing a grandmother—were unremarkable because they "are things most people have to deal with while growing up." As to Land's mental state, we believe Land's history of deception and criminality, which would almost certainly have been revealed to the jury because they were an integral part of Dr. Boyer's diagnosis, substantially undercuts any potential benefit her mitigation testimony might have had. We cannot say that the state court's determination that Land was not prejudiced by his counsel's sentencing strategy was an unreasonable application of clearly established Federal law.

Having considered each of Land's claims, we find no support for a reversal of the district court's denial of habeas relief.

**AFFIRMED**