[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17149

_____

D.C. Docket No. 4:14-cv-00110-CDL

LEON TOLLETTE,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(May 29, 2020)

Before ED CARNES, Chief Judge, and MARCUS and JORDAN, Circuit Judges.

PER CURIAM:

Leon Tollette traveled from Los Angeles, California, to help Xavier Womack

and Jakeith Robinson with the armed robbery of a Brink's armored truck in

Columbus, Georgia.  The three men followed the truck to SouthTrust bank.  As John Hamilton returned to the truck with a money bag, Mr. Tollette approached from behind and shot him at close-range in the head, back, and legs, killing him in the process.  The drivers of the Brink's truck and of a nearby Wells Fargo truck shot at Mr. Tollette as they chased him, with Mr. Tollette and Mr. Womack returning fire.  Mr. Tollette also tried to shoot the responding police officers but surrendered when he ran out of bullets.  *See Tollette v. State*, 621 S.E. 2d 742, 745–46 (Ga. 2005).

Georgia charged Mr. Tollette with malice murder, armed robbery, and other crimes related to the killing of Mr. Hamilton.  On the first day of jury selection, Mr. Tollette pleaded guilty to malice murder, felony murder, armed robbery, possession of a firearm by a convicted felon, possession of a firearm during the commission of a crime, and two counts of aggravated assault.

After a sentencing proceeding, the jury returned a death sentence for Mr. Tollette's murder of Mr. Hamilton after finding beyond a reasonable doubt that there were two aggravating factors: (1) Mr. Tollette committed the murder during another capital felony (i.e., armed robbery); and (2) Mr. Tollette committed the murder to obtain money.  The trial court sentenced Mr. Tollette to death for the murder, imposed a life sentence for the armed robbery, and terms of years for the other crimes.  The trial court later denied Mr. Tollette's motion for a new trial.

The Georgia Supreme Court affirmed Mr. Tollette's convictions and

sentences on direct appeal.  In part, it concluded that trial counsel did not render ineffective assistance with respect to mitigation at sentencing and that Mr. Tollette suffered no prejudice from counsel's failure to call his sister as a witness at the sentencing proceeding.  *See id.* at 745–50.

The state post-conviction court denied Mr. Tollette's habeas corpus petition, and the Georgia Supreme Court denied a certificate of probable cause.  Mr. Tollette then filed a federal habeas corpus petition under 28 U.S.C. § 2254, but the district court denied relief.  Following a review of the record, and with the benefit of oral argument, we affirm the district court's decision.[1]

## I

The district court's denial of Mr. Tollette's habeas corpus petition is subject to plenary review.  *See Fults v. GDCP Warden*, 764 F.3d 1311, 1313 (11th Cir. 2014).  But because his habeas corpus petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104–132, 110 Stat. 1214 (1996), Mr. Tollette can obtain relief only if the state court's adjudication of a claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State

---

[1] Because we write for the parties, we assume their familiarity with the record and set out only what is necessary to explain our decision.  As to any contentions not discussed in this opinion, we summarily affirm.

3

court proceeding." 28 U.S.C. § 2254(d)(1)–(2). AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1107 (11th Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011)). This standard is "difficult to meet." *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013).

A state court decision is "contrary to" clearly established federal law when "it arrives at an opposite result from the Supreme Court on a question of law, or when it arrives at a different result from the Supreme Court on 'materially indistinguishable' facts." *Owens v. McLaughlin*, 733 F.3d 320, 324 (11th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). *See, e.g.*, *Premo v. Moore*, 562 U.S. 115, 131 (2011) ("A state-court adjudication of the performance of counsel under the Sixth Amendment cannot be 'contrary to' *Fulminante*, for *Fulminante*—which involved the admission of an involuntary confession in violation of the Fifth Amendment—says nothing about the *Strickland* standard of effectiveness."). A state court decision cannot be contrary to clearly established federal law "where no Supreme Court precedent is on point." *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003).

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, (2011)

4

(emphasis in original and quotation marks and citation omitted).  As the Supreme Court has put it:

> [A]n unreasonable application [of clearly established federal law] must be objectively unreasonable, not merely wrong; even clear error will not suffice.  Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*White v. Woodall*, 572 U.S. 415, 419–20 (2014) (internal quotation marks and citations omitted).

Under § 2254(d)(2), a federal court must afford "substantial deference" to a state court's factual determinations.  *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2277 (2015).  And it must presume that those findings are correct unless the petitioner rebuts that presumption by "clear and convincing evidence."  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001) (quoting § 2254(e)(1)).  But "[i]f the petitioner can rebut that presumption, we are not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them."  *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 651 (11th Cir. 2014) (citation and internal quotation marks omitted) (also explaining that the presumption of correctness is limited to findings of facts and does not apply to mixed determinations of law and fact).

With these principles in mind, we address Mr. Tollette's arguments.

5

## II

Mr. Tollette contends that the prosecutor made several incorrect and improper statements during closing argument and argues that those statements entitle him to a new sentencing proceeding. Like the district court, we conclude that Mr. Tollette is not entitled to habeas relief on this claim.

Claims of prosecutorial misconduct based on purportedly improper remarks are subject to a two-part test: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *Conner v. GDCP Warden*, 784 F.3d 752, 769 (11th Cir. 2015) (citation omitted). The Supreme Court has held that improper prosecutorial arguments and statements can render a death sentence unconstitutional if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted). To succeed, therefore, Mr. Tollette must show that the "improper argument[s] rendered the sentencing stage trial fundamentally unfair." *Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001). In a capital case like this one, "[a]n improper prosecutorial argument . . . render[s] a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument[s] the defendant would not have received a death sentence." *Id.* (internal citation omitted).

In deciding whether a prosecutor's arguments deny a defendant due process, a court considers "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." *Land v. Allen*, 573 F.3d 1211, 1219–20 (11th Cir. 2009) (citation omitted). Also relevant is "the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused," and "the strength of the competent proof to establish the guilt of the accused." *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994) (citations omitted).

Mr. Tollette argues that the prosecutor obfuscated the difference between a life sentence without the possibility of parole and life imprisonment; misrepresented the number of years before he would be parole eligible; referred to life imprisonment as life with parole over the trial court's corrections; improperly told the jury that most murders are not death eligible; and invoked religious authority as mandating a death sentence. Mr. Tollette asserts that these improper statements, among other things, led to jury confusion about the possible sentences available. According to Mr. Tollette, the statements—which he says the trial court failed to cure—violated due process by making the trial fundamentally unfair, increased the likelihood of the death penalty, and undermined confidence in the outcome of the case.

On direct appeal, the Georgia Supreme Court addressed Mr. Tollette's

7

arguments concerning the prosecutor's remarks during closing argument. Noting that no objections to certain of the remarks had been made by the defense, the Georgia Supreme Court held that there was no "reasonable probability" that any improper arguments "led to the imposition of a death sentence." *Tollette*, 621 S.E. 2d at 747. With respect to the prosecutor's statement that "the just punishment under a lot of religions would be death for what [Mr. Tollette did]," the Georgia Supreme Court agreed with Mr. Tollette that the argument was "improper," but concluded that there was no reasonable probability that it led to the jury's imposition of a death sentence. *See id.* at 748. With respect to the prosecutor's arguments that "prison is too good for [Mr. Tollette]" and that "prison for seven years and re-paroled" was insufficient, the Georgia Supreme Court ruled that they too were improper—because the likelihood of parole is generally "an improper subject matter for argument by counsel"—but similarly concluded that they were "entirely harmless." *Id.* The "jury had life without parole as an available sentence and was properly charged, through an original charge and an additional charge given during deliberations, that a sentence of life without parole would mean that [Mr.] Tollette would never be eligible for parole unless later adjudicated innocent." *Id.*

The district court acknowledged that the Georgia Supreme Court did not cite any federal cases in discussing Mr. Tollette's prosecutorial misconduct claims but concluded that those claims had been adjudicated on the merits on direct appeal. *See*

D.E. 43 at 76–83.  It noted, as well, that Mr. Tollette had also failed to cite in his direct appeal brief the federal cases on which he now relied, and perhaps that was the reason the Georgia Supreme Court did not cite or discuss federal law.  *See id.* at 77–78 & nn. 24, 25.  The district court also observed that the Georgia Supreme Court's substantive analysis was interchangeable (i.e., equivalent) with federal law.  *See id.* at 79.

On the merits, the district court first rejected Mr. Tollette's argument that the Georgia Supreme Court failed to undertake a holistic due process review and consider all of the improper arguments together to assess their cumulative impact on the sentencing proceeding.  "[W]hile the Georgia Supreme Court discussed each allegedly improper comment separately, it necessarily had to look at the entire sentencing hearing, including all other improper arguments, to determine if the death sentence was 'imposed under the influence of passion, prejudice, or any other arbitrary factor.'  O.C.G.A. § 17-8-75(c)(1)."  *Id.* at 81–82.  The district court then concluded that the Georgia Supreme Court's lack of prejudice determination was subject to deference under AEDPA and was not unreasonable.  The district court also specifically addressed the prosecutor's improper references to religion.  Applying Eleventh Circuit law, it concluded for several reasons that the Georgia Supreme Court's decision about lack of prejudice was not unreasonable.  First, the prosecutor's religious references were "isolated and brief," and "[r]eligion in no way

9

permeated [the prosecutor's] entire argument." *Id.* at 85. Second, Mr. Tollette's counsel did not object to the religious references, and that failure weighed "against finding the argument was severe enough to render the sentencing hearing fundamentally unfair." *Id.* Third, Mr. Tollette's counsel countered the prosecutor's references to religion with his own religious argument, asking the jury to ask itself "What would Jesus do"? *Id.* at 85–86. Mr. Tollette's counsel, the district court reasoned, was able to "lessen the impact of the prosecutor's improper religious argument by countering with his own plea for the jurors to look to their religious values when deciding [Mr.] Tollette's fate." *Id.* at 86. Fourth, the trial court had sua sponte instructed the jury—albeit during the defense's closing argument—that it was "not [to] invoke your religious beliefs to determine punishment in this case." *Id.* This instruction, concluded the district court, was "certainly broad enough to lessen any prejudicial impact from the prosecutor's improper comments." *Id.* at 87. Fifth, the "strength of the aggravating factors"—including the planning of the armed robbery, Mr. Tollette's lying in wait, Mr. Tollette's shooting of Mr. Hamilton from behind, and Mr. Tollette's shooting at the police—when "compared to the lack of evidence in mitigation"—the "only mitigation evidence was a plea from [Mr.] Tollette's mother"—also cut against a finding of prejudicial impact. *Id.*

Like the Georgia Supreme Court, we conclude that the prosecutor's comments about parole and religion were improper. *See, e.g., Romine*, 253 F.3d at 1366–67.

10

Applying AEDPA deference, however, we agree with the district court that the decision of the Georgia Supreme Court regarding prejudice was not unreasonable. To the thorough analysis of the district court, we add only that the Georgia Supreme Court's decision is consistent with the Supreme Court's opinion in *Darden*.

In *Darden*, the prosecutor made a closing argument condemned by every court that reviewed it. *See Darden*, 477 U.S. at 179. There, a jury found a habeas petitioner guilty of murder, robbery, and assault with intent to kill. *See id.* at 170. During closing argument, the prosecution blamed the crime on the department of corrections for furloughing the defendant, implied that the death penalty would be the only guarantee against future similar acts, and referred to the defendant as an "animal." *Id.* at 180. The Supreme Court held that those comments "did not deprive [the defendant] of a fair trial" because the "prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or right to remain silent." *Id.* at 181–82. Overwhelming evidence supported a guilty finding on all charges and "reduced the likelihood that the jury's decision was influenced by argument." *Id.* at 182. The "bar for granting habeas based on prosecutorial misconduct is a high one." *Allen*, 573 F.3d at 1220. For the reasons given by the district court, the Georgia Supreme Court's decision with respect to prejudice was not an unreasonable application of federal law as established by the Supreme Court.

11

## III

Mr. Tollette asserts two ineffective assistance of counsel claims. First, he contends that his trial counsel (and the counsel who represented him on the new trial motion) did not properly investigate or present available mitigating evidence at sentencing. Second, he argues that his appellate counsel failed to raise his trial counsel's (and new trial counsel's) deficient performance with respect to mitigation. These claims present "mixed question[s] of law and fact subject to *de novo* review." *Williams v. Allen*, 542 F.3d 1326, 1336 (11th Cir. 2008) (quoting *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005)). But, as noted above, claims adjudicated on the merits by a state court receive deference under AEDPA.

## A

The Sixth Amendment entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" considering "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 686, 688 (1984). That standard is necessarily a general one, as it requires "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89. The question is whether counsel's conduct is "outside the wide range of professionally competent assistance." *Id.* at 690.

12

To succeed on his ineffective assistance of counsel claims, Mr. Tollette must show two things.  He must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and he must establish that "there is a reasonable probability that, but for counsel's unprofessional errors,  the result of the proceeding would have been different."  *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quotation marks and citation omitted).

When addressing performance, courts review counsel's conduct in a "highly deferential" manner and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  To overcome the *Strickland* presumption of reasonableness, Mr. Tollette must show that "no competent counsel would have taken the action that his counsel did take."  *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).  In other words, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial," *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc), then Mr. Tollette cannot establish deficient performance.

With respect to prejudice, Mr. Tollette must demonstrate a "reasonable probability that, absent [counsel's] errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pooler v. Sec'y, Fla. Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) (citation

13

omitted).  In a state like Georgia, where jury unanimity is required for a sentence of death, the question is whether there is "a reasonable probability that at least one juror would have struck a different balance" and voted against the death penalty.  *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

A "reasonable probability" is one that is "sufficient to undermine confidence in [the sentence]," and does not require a showing that  "counsel's deficient conduct more likely than not altered the outcome of [the petitioner's] penalty proceeding."  *Porter v. McCollum*, 558 U.S. 30, 44 (2005) (quoting *Strickland*, 466 U.S. at 693–94).  Nevertheless, "[t]he likelihood of a different result must be substantial, not just conceivable."  *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc) (citation omitted).  To assess the probability of a different outcome, courts consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation."  *Porter*, 558 U.S. at 41 (citation omitted and alterations adopted).

**B**

Mr. Tollette's mother was the only defense witness at sentencing.  *See Tollette*, 621 S.E. 2d at 749.  She testified that she never married Mr. Tollette's father;  Mr. Tollette had three brothers and two sisters and was a good, loveable, and obedient child; they were a "family of love;" Mr. Tollette played sports when young

14

and did well in school until he met up with "the wrong group;" Mr. Tollette and his stepfather did not have a father-son relationship and were not as close as she would have liked (though Mr. Tollette did respect his stepfather); Mr. Tollette left home at sixteen without her consent because he became associated with the wrong crowd and wanted to experiment "with some things he knew" he could not do while staying at home; Mr. Tollette had a great relationship with his own son; Mr. Tollette was in jail from time to time but would call her regularly; and Mr. Tollette had no drug problem that she knew of. She apologized to Mr. Hamilton's family and begged the jury to spare Mr. Tollette's life. *See* D.E. 43 at 38 (district court order summarizing the testimony of Mr. Tollette's mother).

Mr. Tollette argues that his trial counsel (and the counsel who represented him on the new trial motion) ignored "red flags" and did not properly investigate, develop, and present mitigation evidence to counter the state's aggravating evidence and depiction of the murder. He contends that counsel conducted an 11th hour pro forma investigation that was unreasonable and that did not support their strategic decisions. Sidestepping the matter of performance, we affirm the district court's denial of habeas relief because the Georgia Supreme Court did not unreasonably conclude that Mr. Tollette failed to demonstrate prejudice under *Strickland*.

**1**

Mr. Tollette asserts that with a more timely investigation and expert witnesses,

counsel could have made a credible argument that his actions were a result of or impacted by his upbringing, his early exposure to alcohol, drugs, and violence, and his mental health issues. In Mr. Tollette's view, an adequate investigation would have shown the jury that he was suffering from severe mental illness, depression, impaired cognitive functioning, and substance abuse in the months leading to the murder. Mr. Tollette also argues that trial counsel's failure to use available evidence that he was not a risk of danger in prison, and failure to interview his former girlfriend, prejudiced his case.

In his brief, Mr. Tollette describes the available mitigating evidence that his counsel failed to obtain and present from several witnesses, including his sister, Gladys Lattier, and his former girlfriend, Katrina Wilson. *See* Br. for Appellant at 31–34. We summarize that evidence below.[2]

● Mr. Tollette was born to a single mother struggling with four other young children, and grew up in the Watts and Gardena neighborhoods of Los Angeles, where gunshots were a nightly occurrence, crime (including drug dealing) was rampant, and unemployment and incarceration were high. His sister was responsible for looking after him even though she was just eight years older than him. Drug use, violence and gang activity spilled into the public schools that he and his siblings

---

[2] Trial counsel's investigation and strategy, and the new mitigating evidence presented at the state habeas proceeding, are laid out in detail in the district court's order. *See* D.E. 43 at 16–55.

attended.

● Without a father, Mr. Tollette looked to his older brothers as father figures and protectors. Two of those brothers left home when he was, respectively, six and thirteen. After that, his grades declined, and he gravitated towards gangs. According to cultural anthropologist Dr. Diego Virgil, his gang affiliation was virtually inevitable and predictable given his upbringing, and the gangs filled the vacuum left by his dysfunctional family and impoverished community.

● Due to the problems he encountered, Mr. Tollette had low self-esteem, anxiety, and depression, which left him predisposed to drug and alcohol addiction. In the months leading up to the murder, he experienced his most serious episode of depression due to a confluence of events, including the arrest of his girlfriend (leading to his loss of living arrangements), the death of his biological father, his lack of success in the music business, and his lack of success in dealing drugs due to his own alcohol and drug abuse. He also had mental health issues, including recurrent episodes of major depression and chronic low self-esteem, as described by Dr. Michael Hilton, a forensic psychiatrist.

● Mr. Tollette had a lack of significant disciplinary history while incarcerated in California. That history indicated that he would make a positive adjustment to prison life.

On direct appeal, Mr. Tollette argued that the trial court should have granted

17

his motion for a new trial because his trial counsel "did not prepare adequate mitigation evidence," and asserted that counsel should have called his sister, Ms. Lattier, to testify. *See Tollette*, 621 S.E.2d at 749. The Georgia Supreme Court, applying *Strickland*, rejected Mr. Tollette's Sixth Amendment claim. Putting aside the question of whether counsel's failure to present other witnesses (including Mr. Tollette's sister) was constitutionally deficient, the Georgia Supreme Court concluded that Mr. Tollette "did not suffer sufficient prejudice to warrant relief" because the sister's testimony "would have been merely a 'reiteration of the mother's testimony.'" *Id.*

On post-conviction review, the Georgia Supreme Court denied Mr. Tollette's application for a certificate of probable cause and again concluded that he had failed to demonstrate prejudice resulting from the alleged ineffective assistance of trial counsel (and the counsel who represented him on the motion for a new trial). Although recognizing that the state habeas court had failed to apply the correct *Strickland* prejudice test, the Georgia Supreme Court concluded that the evidence Mr. Tollette presented at the state habeas hearing did not demonstrate prejudice under *Strickland*:

> Nevertheless, after independently applying the correct legal principle to the trial and habeas record, we conclude as a matter of law that, "[i]n exercising its discretion once [the Petitioner] became eligible for a death sentence," the jury would not have been significantly swayed by the testimony that the Petitioner presented on this issue in the state habeas proceedings. We further conclude that trial counsel's not

18

utilizing testimony like that presented by the Petitioner's new expert to challenge the State's characterization of the circumstances of the murder did not result in prejudice sufficient to support the success of the Petitioner's underlying ineffective assistance of trial counsel claim and thus that the Petitioner cannot show a reasonable probability that, had direct appeal counsel raised the ineffective assistance of motion for new trial counsel in litigating trial counsel's ineffectiveness with respect to this issue on direct appeal, the Petitioner would have been granted a new trial on this basis. Therefore, the Petitioner cannot satisfy the cause and prejudice test to overcome the procedural bar to that claim, and it remains procedurally defaulted. Accordingly, we conclude that this issue ultimately is without arguable merit.

D.E. 12-27 at 2 (citations omitted).

Under *Hittson v. GDCP Warden*, 759 F.3d 1210, 1232 (11th Cir. 2014), this denial of a certificate of probable cause by the Georgia Supreme Court constituted an adjudication on the merits of Mr. Tollette's ineffective assistance of counsel claims for purposes of AEDPA. And it is this denial that we consider under *Wilson v. Sellers*, 138 S. Ct. 1188, 1193–95 (2018), with respect to the issue of prejudice. *See Knight v. Fla. Dept. of Corrections*, ___ F.3d ___, 2020 WL 2092592, *9 n.3 (11th Cir. May 1, 2020).

With respect to most of the mitigating evidence summarized above, the district court did not address prejudice, as it found that the state habeas court had reasonably concluded that Mr. Tollette's trial counsel (and counsel on the motion for a new trial) had conducted an adequate investigation and made a reasonable choice of trial strategy based on that investigation. *See* D.E. 43 at 55. With respect to some of the mitigating evidence summarized above, however, the district court

19

did analyze prejudice. For example, concerning the failure of counsel to interview Mr. Tollette's former girlfriend and present her testimony, the district court—in addition to finding that performance was constitutionally adequate—concluded that there was no resulting prejudice. *See id.* at 61–62.

Applying AEDPA deference on the issue of prejudice, we conclude that the Georgia Supreme Court's resolution of that issue was reasonable. And it was reasonable both in its decision on direct appeal (with respect to the testimony of Mr. Tollette's sister) and in its decision denying a certificate of probable cause on collateral review (with respect to the other mitigating evidence presented at the state habeas proceeding). The reasons are as follows.

First, the aggravating evidence—including the planning and carrying out of the armed robbery and murder, Mr. Tollette's three prior convictions, Mr. Tollette's gang affiliation, and the victim impact statements—was relatively strong. That is not conclusive, but it is relevant. We note as well that Mr. Tollette apparently showed no remorse during his statement to the police and even laughed during a portion of that statement. *See* D.E. 43 at 38–39. And he apparently "pursed his lips or bl[ew] a kiss at one of [Mr.] Hamilton's daughters when she was walking off the witness stand after finishing her victim impact statement." *Id.* at 39 (citing D.E. 9-2 at 61).

Second, some of the mitigating evidence presented at the state habeas

20

proceeding had the potential for being a two-edged sword. *See, e.g.*, *Ponticelli v. Secretary*, 690 F.3d 1271, 1296 (11th Cir. 2012). For example, the testimony about Mr. Tollette's gang membership was not all mitigating in nature. Mr. Tollette's own gang expert, Dr. James Vigil, testified that Mr. Tollette joined a drug trafficking gang, and could have been attracted to that gang because its members had money, nice cars, and women. Evidence about gang membership, moreover, could have opened the door to evidence of future dangerousness, an issue Mr. Tollette's counsel had succeeded in keeping out. Finally, such evidence could have also been countered by evidence that some of Mr. Tollette's friends eventually left the gang and pursued legitimate careers.

Third, the testimony from Mr. Tollette's former girlfriend might have opened the door to evidence of an armored truck robbery in California in which Mr. Tollette was a suspect. Significantly, that robbery bore some similarities to the armed robbery in which Mr. Tollette murdered Mr. Hamilton.

Fourth, the mental health evidence in favor of Mr. Tollette was not overwhelming. Dr. Hilton, who testified for Mr. Tollette at the state habeas proceeding, concluded that he had recurrent episodes of major depression and chronic low self-esteem. Those opinions were consistent with the initial mental evaluations of Mr. Tollette, carried out by Drs. Karen Bailey-Smith and Margaret Fahey of West Central Georgia Regional Hospital. Drs. Bailey-Smith and Fahey

found that Mr. Tollette was depressed and his insight into his condition was deficient. Drs. Bailey-Smith and Fahey also found, however, that he had a normal intellect, an IQ of 89, and judgment that was "relatively intact." *See* D.E. 43 at 30. Mr. Tollette had a profile of an individual who was seen by others as angry and argumentative, and a diagnosis of personality disorder not otherwise specified with antisocial and schizotypal features. *See id.* at 31. Dr. Hilton agreed with this diagnosis. *See id.* at 47.

Furthermore, a psychologist, Dr. Daniel Grant, testified at the state habeas proceeding that Mr. Tollette was not insane or under a delusional compulsion at the time of the murder; that he was not mentally disabled; that he was not severely mentally ill; and that he exhibited antisocial personality traits. *See id.* at 47–48. Dr. Grant had told trial counsel that there was "not much to work with," that Mr. Tollette suffered from borderline personality disorder, and that the "best" he could do was testify that Mr. Tollette could be "useful" in prison if his California prison records did not show disciplinary problems. *See id.* at 32–33.[3]

---

[3] Mr. Tollette argues that the state habeas court erred in not considering the totality of the post-conviction mitigating evidence he presented. *See* Br. for Appellant at 48–49. But we are not reviewing the prejudice determination of the state habeas court. Rather, we are reviewing (and giving AEDPA deference to) the Georgia Supreme Court on direct appeal and in denying a certificate of probable cause on collateral review. And there is no claim that the Georgia Supreme Court failed to view the mitigating evidence holistically. In any event, we have considered all of the mitigating evidence cumulatively in conducting our own review on the matter of prejudice.

22

**2**

Mr. Tollette separately contends that trial counsel could have and should have presented evidence to counter the state's characterization of the shooting as an execution-style murder.  He asserts that, contrary to what some of the state's witnesses (such as Cornell Christian and Sherry Ziegler) testified, there was evidence that his first shot was not to Mr. Hamilton's head.

In his statement to the police after the murder (which was played for the jury at the sentencing proceeding), Mr. Tollette said that he shot when Mr. Hamilton turned around and saw him and continued to shoot out of fear because Mr. Hamilton did not fall when first shot.  The testimony of Dr. Geoffrey Smith, the medical examiner, and Ralph Tressel, a crime scene analyst, at the state habeas proceeding also indicated that Mr. Tollette did not first shoot Mr. Hamilton in the head.  For example, Mr. Tressel testified that Mr. Tollette's first two shots were to the legs, the third was to the back, and the fourth was to the head.  Mr. Tressel did not believe that Mr. Tollette had approached Mr. Hamilton from behind and shot him in the back of the head.  Dr. Smith testified that the shots to the legs entered from the front, and Mr. Hamilton most likely had to have been facing upward when he received those wounds.  If Mr. Hamilton had been shot in the head first and fallen on the ground face down, then he could not have sustained those shots in the legs because the trajectories would have been wrong.  So the likely scenario is that Mr. Hamilton was

shot in the legs while he was still standing.  *See* Br. for Appellant at 41–47.

The district court, applying AEDPA deference, concluded that the Georgia Supreme Court's decision on prejudice as to this evidence concerning the sequence of the shots, *see* D.E. 12-27 at 1–2, was reasonable: "A fairminded jurist could conclude that there was no reasonable probability of a different sentence even if the jury thought [Mr.] Tollette shot [Mr.] Hamilton first in both of his legs to disable him and then placed the gun six inches from [Mr.] Hamilton's head and pulled the trigger."  D.E. 43 at 69.

We agree with the district court that the Georgia Supreme Court's prejudice determination was reasonable.  First, two eyewitnesses (Mr. Christian and Ms. Ziegler) testified that Mr. Tollette first shot Mr. Hamilton in the head.  Second, Dr. Smith admitted that he did not "know the order in which the gunshot[s] were sustained," and indicated that "there are a number of possibilities."  D.E. 43 at 67 (quoting D.E. 10-24 at 19).  Third, Mr. Tressel based his opinion in part on Mr. Tollette's statement to the police.  *See id.* at 66 n.23.  Fourth, even if Mr. Tollette first shot Mr. Hamilton in the legs and in the back, he then also shot him in the head from very close range.  The jury could have easily found that the sequence of shots—even under Mr. Tollette's account—still amounted to an execution-style killing of Mr. Hamilton.

24

**3**

As noted, Mr. Tollette contends that his appellate counsel rendered deficient performance by not raising the deficient performance of trial counsel (and counsel who represented him on the motion for a new trial) with respect to their representation at sentencing.  Because Mr. Tollette has failed to demonstrate that his trial counsel or his new trial counsel rendered deficient performance, it follows that appellate counsel did not fall below the Sixth Amendment standard.  *See Brooks v. Comm'r*, 719 F.3d 1292, 1300 (11th Cir. 2013).  *See also Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) ("It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim.").

**IV**

The district court's denial of Mr. Tollette's habeas corpus petition is affirmed.

**AFFIRMED.**